Philip **KERNER**, Appellant,

v.

Arthur S. **FLEMMING**, Secretary of Health, Education and Welfare, Respondent.

No. 52, Docket 26290.

United States Court of Appeals Second Circuit.

Argued Oct. 10, 1960.

Decided Nov. 18, 1960.

Timothy P. Walsh (of Hardin, Hess & Eder), New York City, for appellant.

Cornelius W. Wickersham, Jr., U. S. Atty., Eastern Dist. of New York, Brooklyn, N. Y. (Malvern Hill, Jr., Asst. U. S. Atty., and Judith Gelb, Confidential Asst. to the U. S. Atty., Brooklyn, N. Y., on the brief), for respondent.

Before CLARK and FRIENDLY, Circuit Judges, and DIMOCK, District Judge.

**918**

FRIENDLY, Circuit Judge.

■ This is an action under § 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g), to review a decision of the Secretary of Health, Education and Welfare, hereafter the "Secretary," denying plaintiff's application for disability insurance benefits and the establishment of a period of disability. Plaintiff appeals from an order of the District Court for the Eastern District of New York denying his motion for summary judgment and granting a cross-motion of the Secretary for summary judgment and dismissal of the complaint. We think the case called for exercise of the District Court's power under § 205(g) to "order additional evidence to be taken before the Secretary." Accordingly, we reverse the grant of summary judgment and the dismissal of the complaint, and remand in order that the District Court may direct further evidence to be so taken.

Section 223 of the Social Security Act, 42 U.S.C.A. § 423, enacted in 1956, provides disability insurance benefits for certain individuals between the ages of 50 and 65 in the event of "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." Section 216(i) (1), 42 U.S.C.A. § 416(i) (1), makes the same definition applicable to § 215(b) (1) (B), 42 U.S.C.A. § 415 (b) (1) (B), enacted in 1954, which excludes periods of disability from the divisor in determining average monthly wages—the so-called "disability freeze."

The plaintiff, Philip Kerner, was born on September 15, 1896. A veteran of World War I, he worked as a carpenter, automobile salesman, and mechanic. In the late 1940s he took up the occupation of reupholstering furniture on a self-employed basis. Apparently he has lived alone for many years. Since the early 1950s, he has had diabetes, which, after six months on insulin, he has controlled by careful diet with a maximum of 1550 calories daily. In June, 1956, he suffered

a heart attack; after a day at Beekman Street Hospital, he was transferred to the Veterans Administration Hospital in Brooklyn and remained there until August. The diagnosis was "infarction of the myocardium due to arteriosclerotic coronary thrombosis," "arteriosclerotic heart disease" and "diabetes mellitus"; the final summary reported all these as "Treated. Improved." In September, 1956, he was admitted to the New York State Veterans Camp at Mt. McGregor. He was there until January, 1957, and again from August to December, 1957. On both occasions, as a result of medical examination, he was assigned to a group engaged in no physical activity. Between his stays at Mt. McGregor and thereafter he endeavored to live in New York. He found this endeavor well nigh impossible since his only income was a non-service connected disability pension of $66.15 a month awarded by the Veterans Administration and he required a room where he could prepare his own meals. On July 15, 1958, he was admitted to the Veterans Administration domiciliary at Bath, N. Y., where he has since been.

In October, 1956 and May, 1957, Kerner applied to establish a period of disability and for a disability pension under the provisions of the Social Security Act cited above. The Bureau of Old Age and Survivors Insurance denied these applications in November, 1957. Kerner requested a hearing; this was held before a referee at Bath a year later, in November, 1958. After reviewing the medical and other evidence which we will summarize below, and conceding that applicant "would be unable to return to the strenuous work which he had been doing as a self-employed furniture repairman," the referee concluded "it does not appear that his physical condition has been so seriously affected that he would be completely unable to engage in any kind of substantial gainful activity, including some form of light or part-time sedentary work" and that the "fact that work which would be within his capacity to perform may not be readily attainable, cannot be substituted as standards of

disability for the strict standard set forth in the Act, namely, complete inability to do any substantial gainful work." [1] In May, 1959, the Appeals Council of the Department denied review; the referee's decision thereupon became the final decision of the Secretary, 20 C.F.R. § 422.-6(c). Appellant thereupon brought this action, 42 U.S.C.A. § 405(g), to review the Secretary's decision; on cross-motions for summary judgment the District Court dismissed this, as stated above.

The evidence left no doubt that plaintiff met the requirement of a "medically determinable physical or mental impairment which can be expected * * * to be of long-continued and indefinite duration." What was doubtful was whether this had caused "inability to engage in any substantial gainful activity."

The Regulations promulgated by the Department, 20 C.F.R. § 404.1501(d) and (e), give as an example of such a disabling impairment:

> "(3) Diseases of heart, lungs or blood vessels which have resulted in major loss of heart or lung reserve as evidenced by X-ray, electrocardiogram or other objective findings so that, despite medical treatment, it produces breathlessness, pain or fatigue on slight exertion, such as walking several blocks, using public transportation or doing small chores."

The Veterans Administration physician at Mt. McGregor found in August, 1957, that Kerner suffered dyspnea "on moderate exertion"; his own physician found in February, 1958, that he manifested this "on slight exertion." The doctor who examined him for the New York State Department of Social Welfare in April, 1958, reported that "he gets an occasional chest pain and dyspnea on walking upstairs, or other moderate exertion. This is relieved by nitroglycerine and sedatives." This evidence would seem to place Kerner within the example given by the Regulations. However, the Regulations tell us also, in characteristic Janus-faced fashion, that, on the one hand, "The existence of one of these impairments (or of an impairment of greater severity), however, will not in and of itself always permit a finding that an individual is under a disability as defined in the law," and, on the other, "Conditions which fall short of the levels of severity indicated must also be evaluated in terms of whether they do in fact prevent the individual from engaging in any substantial gainful activity."

The evidence on the crucial issue whether plaintiff's medically determinable impairment had resulted in "inability to engage in any substantial gainful activity," was exceedingly unsatisfactory. Plaintiff was not represented by counsel at the hearing. Even the cold type of the record shows that he was highly disturbed.[2] He testified that he does "a lot of walking" but only "on a straight place," since he suffers from shortness of breath when he must climb stairs. He attributed his inability to work not only to his heart ailment, but to the fact that "If you over-exert yourself, even in light work, your caloric intake would have to go up"—with unfavorable results to his diabetic condition.[3] At Bath he

---

1. We note in passing that the word "complete" is the referee's, not Congress's.

2. Although the referee had made every effort to calm the plaintiff, apparently with some success, plaintiff's emotional stress returned when it developed, midway through the hearing, that two employees of the Veterans Administration were improperly in the room. Plaintiff contends this deprived him of a fair hearing. However, after dismissing the two employees from the room, the referee urged plaintiff to state anything he might have omitted because of their presence, and plaintiff did at some length. The District Court thus properly overruled the contention that plaintiff did not receive a fair hearing.

3. The referee dissociated the diabetes from the heart condition; this may well have been an error. See Blumgart, Diseases of the Coronary Arteries, in Cecil & Loeb, Textbook of Medicine (9th ed.), p. 1334.

had been initially assigned to upholstering work in an arts and crafts shop; he refused the assignment both on grounds unrelated to health and because "no doctor in his right mind should have assigned me a 6 hour detail." His duties were then changed to sitting as a watchman in bath rooms one week out of three. He had enjoyed repairing furniture and "wouldn't be up here if I were able to earn $10, two or three hours a day." However, he was convinced that his "ability to do any kind of work is nil," both because of his physical condition and because of the unavailability of appropriate employment; and that a disability pension afforded the only alternative to continued institutionalization, to which he objected on medical as well as on other grounds.[4] He thought " * * * the basic fact is if I don't take care of myself, no one else will. I want to live as long as I can." His testimony revealed great preoccupation on this score. He related that his father had died of a heart attack at 55 and his mother of diabetes at about the same age. He also discussed extensively the problems of controlling diabetes and the physiology of heart disease; he was very fearful of the effect of "a small minute globule of fat." He tests himself for diabetes four times daily and averages one nitroglycerine tablet per day for his heart symptoms. Altogether his testimony abundantly confirmed his personal physician's diagnosis of "anxiety neurosis."[5]

None of the doctors testified and few of the medical reports deal in any illuminating fashion with applicant's ability to work. In September, 1956, the Veterans Administration found Kerner had a general medical disability that was considered to be permanently and totally disabling. The Government challenges the probative effect of this because the statute there controlling speaks of a "disability which is sufficient to render it impossible for the average person to follow a substantially gainful occupation," 38 U.S.C. § 502, whereas the Social Security Act proceeds on an individual basis; this blunts the point but does not eliminate it. In December, 1957, the New York Vocational Rehabilitation Agency refused to accept a referral of applicant, stating "Impairment too severe." On August 23, 1957, the Mt. McGregor physician, in answer to a question in a Department form, "Have you advised applicant not to work?", stated, "Presently in camp, doesn't work"; this report designated Kerner's cardiac functional capacity under American Heart Association ratings as "Marked limitation. III–D."[6] His personal physician's report of February 3, 1958, answered the question as to advice not to work "Yes," and gave the same cardiac ratings. The doctor who examined Kerner in April, 1958, for the Department of Social Welfare reported, "Arteriosclerotic heart disease with anginal syndrome" and "Diabetes mellitus," but made no specific find-

4. Applicant's testimony that he would leave the institution on receiving a pension, if believed as it apparently was, would tend to negative any inference of malingering, since the monetary value of the pension to plaintiff would not greatly exceed, if indeed it would equal, the value of maintenance in an institution.

5. "The patient with anxiety reaction usually believes that his condition is comparatively hopeless as well as serious." English & Finch, Introduction to Psychiatry (1954), p. 146. See also Ginsburg, The Neuroses, 268 Annals of the American Academy of Political and Social Science 55 (1953), reprinted in Curran, Law and Medicine (1960), 503, 569.

6. This rating comes from the American Heart Association's publication, Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Blood Vessels, 5th ed. 1953. Class III, under the heading "Functional Capacity," comprises "Patients with cardiac disease resulting in *marked limitation of physical activity*. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain." Class D, under the heading "Therapeutic Classification," comprises "Patients with cardiac disease where ordinary physical activity should be markedly restricted." Each is the penultimate category in order of severity.

ings on applicant's ability to work. Apart from applicant's negative statements, there was no evidence as to employment opportunities.

■ The Government relies heavily, as it did successfully in the District Court, on the provision in § 205(g) that "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *". Accepting this as we do, we think there was here no substantial evidence that would enable the Secretary to make any reasoned determination whether applicant was "unable to engage in substantial and gainful activity (commensurate with his age, educational attainments, training experience, mental and physical capacities). * * *". Teeter v. Flemming, 7 Cir., 1959, 270 F.2d 871, 874; see Flemming v. Booker, 5 Cir., 1960, 283 F.2d 321. Such a determination requires resolution of two issues—what can applicant do, and what employment opportunities are there for a man who can do only what applicant can do? Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available, Aaron v. Fleming, D.C.M.D.Ala.1958, 168 F. Supp. 291, 295.

Here there was insufficient evidence on either issue. In contrast to the forms in use by many government agencies and private firms, designed to disclose the individual's ability in particular activities such as standing, stooping, lifting, walking, and numerous others, and the statement in the Department's own booklet "Disability and Social Security," that, in cases like the applicant's, evaluation teams should explore "the history, effect of exposure to cold, effect of activity, type and the severity of the pain," Disability Insurance Fact Book, infra note 10, p. 28, here there was basically only a catalog of the names of Kerner's various complaints and contradictory conclusions of the vaguest sort, with no real attempt to demonstrate the extent of impairment of function or the residual capacities he yet possesses. Unsatisfactory as all this was, the evidence as to employment opportunities was even less. Here is a man, admittedly able to do only light work, and this at a location reachable without undue exertion, and presenting a prospective employer with the unattractive combination of age, heart disease, diabetes and acute worry about himself. No one of these factors might be fatal to employment—indeed, the constellation of them may not be—but the Secretary had nothing save speculation to warrant a finding that an applicant thus handicapped could in fact obtain substantial gainful employment.[7]

■ The Government says that dismissal of Kerner's action was right even if all this be so, because he had the burden of proof and did not meet this. It points to the provisions of § 216(i)(1) and § 223(c)(2), 42 U.S.C.A. §§ 416(i)(1) and 423(c)(2), that "An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required." We may agree that, under the cited sections[8] and under § 7(c) of the Administrative Procedure Act, 5 U.S.C.

7. The District Judge singled out testimony given by plaintiff that when he came to Bath he "made a number of suggestions," notably that "They were ruining the oil cloth" and that casters ought to be "put on the furniture so the linoleum would not be torn, and easier for everyone to operate." This led the judge to believe that if plaintiff "were to seek employment as a foreman in an upholstery or similar establishment, his trained skill would enable him to function as a supervisor. * * *" We doubt the evidence sufficed to show that plaintiff had adequate supervisory skills and the referee made no such finding. Moreover, the judge's conclusion seems to ignore the common practice of promoting from within, seniority provisions, and the like.

8. Congress has often spoken far more clearly when it has desired to fix a burden of proof. See, e. g., Internal Revenue Code of 1954, §§ 534(a), 5649, 6902(a), 7422(a), 7454(a), 7491, 26 U.S.C.A. §§ 534(a), 5649, 6902(a), 7422(a), 7454(a), 7491.

A. § 1006(c), an applicant for a disability pension has the ultimate burden of persuasion and that a reviewing court ought not order the grant of a pension to an applicant who has not met this. However, it does not follow that the court is bound to sustain a denial of disability benefits where the applicant has raised a serious question and the evidence affords no sufficient basis for the Secretary's negative answer. For the sections relied on by the Government have no greater stature than the broad provision in § 205(g), 42 U.S.C.A. § 405 (g), that the reviewing court "may, at any time, on good cause shown, order additional evidence to be taken before the Secretary * * *" a provision which seems to have been inserted for the very purpose of dealing with such cases.[9] We think that was the appropriate course for the District Judge to have followed here, as Judge Kaufman did in Jacobson v. Folsom, D.C.S.D.N.Y.1957, 158 F.Supp. 281. It should not be hard to provide better medical evidence as to what work plaintiff can and cannot do, and the Secretary's expertise should enable him readily to furnish information as to the employment opportunities (including those in sheltered workshops), or the lack of them, for persons of plaintiff's skills and limitations. We recognize that the Department must process many thousands of disability applications annually and that it is impracticable to treat even the relatively small proportion that go to hearing with the elaboration of the trial of a personal injury case.[10] We do not insist upon anything approaching that; and the time and effort required to make an adequate record are often less than what is needed for an effort, necessarily vain, to distill supportable conclusions from an inadequate one. In sharp contrast to the course adopted with reference to disability determination of the Veterans Administration, 38 U.S.C. § 211(a), Congress has seen fit to subject the Secretary's decisions to judicial scrutiny. Even with the limited scope of review conferred, a court cannot properly sanction a decision in a proceeding of this nature reached with such a lack of evidence to permit a rational determination as here.

We therefore reverse so much of the judgment as grants summary judgment for the defendant and dismisses the complaint, with instructions to the District Court to remand to the Secretary to take further evidence.

9. It seems significant that this provision is much more broadly worded than the corresponding provision in many economic regulatory statutes, where the proceedings before the administrative agency are adversary in nature and Congress justifiably assumed that parties would normally have the assistance of counsel. See, e. g., Federal Trade Commission Act, 15 U.S.C.A. § 45(c); Securities Act of 1933, 15 U.S.C.A. § 77i(a); Securities Exchange Act of 1934, 15 U.S.C.A. § 78y(a); Public Utility Holding Company Act, 15 U.S.C.A. § 79x(a); National Labor Relations Act, 29 U.S.C.A. § 160 (e). Contrast with these statutes the more liberal remand provision of the Railway Unemployment Insurance Act, 45 U.S.C.A. § 355(f), which is also applicable to the Railroad Retirement Act, 45 U.S. C.A. § 228k.

10. During 1959 the Bureau of Old Age and Survivors Insurance adjudicated an average of 298,500 claims per month, of which 37,500 were denied; 1,450 appeal hearings were held each month; 530 petitions for review were filed under § 205 (g). See Gellhorn & Byse, Administrative Law, Cases and Comments (1960 ed.), p. 661, fn. 36. These figures are for all types of cases. However, in 1958, 50% of the total requests for reconsideration and over 70% of the hearing requests were on the issue of disability. As of March 31, 1959, 189 disability cases were pending in the federal courts; these constituted 60% of all social security cases so pending. Disability Insurance Fact Book, prepared by the Staff of the Subcommitte on the Administration of the Social Security Laws for the Use of the Committee on Ways and Means (1959), p. 5.