Joseph **WALKER**, Plaintiff,

v.

Abraham A. **RIBICOFF**, Secretary, Department of **Health, Education &amp; Welfare,** Defendant.

**Civ. A. No. 35749.**

United States District Court
N. D. Ohio, E. D.

Oct. 19, 1962.

George T. Tarbutton, Columbus, Ohio, Robert J. Murphy, Cleveland, Ohio, for plaintiff.

George Morrison, Asst. U. S. Atty., Russell E. Ake, U. S. Atty., Burt W. Griffin, Asst. U. S. Atty., Cleveland, Ohio, for defendant.

KALBFLEISCH, District Judge.

This is a review of the final decision of the Secretary of Health, Education and Welfare that the plaintiff is not entitled to the establishment of a period of disability nor to disability insurance benefits under Title 42 U.S.C.A. §§ 416(i) and 423. Both the plaintiff and the Government have moved for summary judgment.

The hearing before the examiner was conducted on April 29, 1959. The last medical exhibit appearing in the file is dated April 30, 1959. The plaintiff's petition was filed in this Court on November 21, 1959, and the Government's answer bears the date of March 16, 1960. The case was not prosecuted further until May

of 1962 when the plaintiff moved for summary judgment.

The following information has been obtained from a careful study of the record and was before the hearing examiner, whose decision refusing the request for a disability period and disability payments was adopted by the Appeals Council.

The applicant was born in 1900. He has a seventh grade education. For some thirty years prior to 1955 he had been employed as an electrician by the Westinghouse Company. On March 29, 1955, he was exposed to a massive injestion of carbon tetrachloride, and thereafter was under the care of Dr. Charles W. Brown. He had continued to visit Dr. Brown at least once every two weeks until April of 1959, when the medical file ends.

The applicant continued his work from the time of the accident on March 29, 1955, until July 7 of that year, when he was ordered by a physician to quit. The record shows that the work he was doing during this period was of an unusually light nature.

In August of 1956 the applicant was hospitalized for three days. The hospital's diagnosis indicated the patient was suffering from arthritis, recurrent sinus tachycardia, anxiety state, recurrent hepatitis, and spastic bowel. Under the heading "History of Present Illness," the record states: " * * * apprehensive since he fell into carbon tet one & half years ago. Repeated sinus tachycardia attacks with pulse 140–180. Attacks of weakness, poor sleep and considerable weight loss."

In March of 1957 the applicant was again admitted to the hospital, this time for four days. The diagnosis was anxiety tension and paroxysmal auricular tachycardia. On December 17, 1956, February 17, 1957, May 6, 1958, and December 7, 1958, he was given emergency room treatment at the hospital. On each of the occasions the diagnosis was sinus tachycardia.

There are five reports from the applicant's physician, Dr. Charles W. Brown, the first dated December 18, 1956, and the last dated April 30, 1959. In the first report Dr. Brown stated that the present illness first occurred about two years before that date, and the applicant became unable to work in April of 1955. (It should be noted that he had continued to be employed until July of 1955. The applicant stated that the position required no real effort. "All I did was go around with the men and told them what to do." (Tr., p. 039.) On the instructions of a Dr. Biddle, since deceased, the applicant quit work on July 7, 1955, and has not been employed since. (Tr. 040.))

The first report reveals that the applicant was at that time suffering from weakness, arthritis, liver disease and sinus tachycardia. He was ambulatory and partially house confined. The condition was considered static, and Dr. Brown had advised the patient not to work. The functional capacity of his heart was listed as a Class 3 (marked limitation). There was dyspnea on slight and moderate exertion. There were attacks of sinus tachycardia every few weeks.

The next report from Dr. Brown was dated May 29, 1957. It comments that there was a liver enlargement, but no heart enlargement. There was slight dyspnea on slight exertion and moderate dyspnea on moderate exertion. There were recurrent sinus tachycardia attacks every three to four months. The diagnosis was sinus tachycardia, recurrent hepatitis and enuritis.

On May 13, 1958, a claims examiner reported having had a conversation with Dr. Brown. That report states that Dr. Brown believed the prime reason for the patient's cessation of work was the carbon tetrachloride accident:

"As a result the W/E has 'some liver damage' and episodes of tachycardia requiring hospitalization. W/E is treated with 'liver medicine' and digitalis during acute episodes of tachycardia, maintained on quinidine. As long as the W/E takes his quinidine regularly he is O.K. but if he runs out or laxes on taking it, he gets into difficulty.

"The doctor stated one of the main reasons the W/E is not working now is 'fear,' although his general health is very poor.

"He is unable to return to his job at Westinghouse, but Dr. says he could do light work such as watchman's job."

(On April 30, 1959, about a year later, Dr. Brown wrote that taking quinidine, three grams twice a day, "definitely *cut down on the frequency and severity* of [the patient's] sinus tachycardia." (Emphasis added.) He did not then say that the drugs made the patient "O.K." In fact, one month after the examiner's report, Dr. Brown stated that severe attacks were then occurring six to ten times a year, instead of once every three or four months as had been the case in 1957.)

The third report from Dr. Brown was dated June 18, 1958. It mentioned sinus tachycardia attacks with a pulse rate of 160–180. The doctor again classed his heart condition as Class 3 (marked limitation) and commented that six to ten times a year he had severe sinus tachycardia attacks. The report dated April 13, 1959, indicates that the attacks were now occurring once a month. There was also atrophy of the liver. There was no response to therapy. The patient's condition was static, without improvement, and he was adjudged unable to work. Under the heading "Remarks" the doctor said the patient was "100% disabled to ever holding [sic] a job." The other conditions mentioned in the previous reports also continued.

Another doctor who examined the patient was F. J. Heringhaus. His first report was dated July 19, 1957. In it he stated that the patient's heart was of normal size and shape with a regular rhythm and no abnormal sounds. An electrocardiogram gave a normal report. A chest X-ray showed evidence of emphysema and chronic bronchitis, with a normal sized heart. An X-ray of the gastrointestinal tract and gall bladder indicated they were normal. Laboratory tests were normal. There was dyspnea on slight exertion. The patient had "1. Severe anxiety tension state and 2. attacks of paroxysmal auricular tachycardia." The report stated that Dr. Heringhaus had not advised the patient not to work.

A second report from Dr. Heringhaus on June 15, 1958, stated that the patient's condition was static. "This man will probably not be any better ever. He has a severe anxiety neurosis plus paroxysmal tachycardia." It again commented that the doctor had not advised the patient not to work. It suggested that his heart condition was a Class 2 limitation (slight limitation), rather than a Class 3 as diagnosed by Dr. Brown.

The last report from Dr. Heringhaus was dated April 2, 1959. It reported that an EKG was normal. The patient suffered from weakness, heart pounding, attacks of tachycardia of 160–180 beats per minute. It commented that the patient "can't do much in way of work." Under "Remarks" the doctor commented, "Patient disabled mainly because of chronic anxiety and tension. Occasional attacks of tachycardia. Seems about 80% disabled."

The record also discloses a letter from Albert M. Voegele, M.D., to Dr. Oser in Columbus. In this letter, after recounting the history of the case given in the reports of the other doctors Dr. Voegele noted that the patient reported the attacks of tachycardia were associated "with a 'ball-like' substernal sensation which is also noted on exertion during the past nine months; the pain radiates to the left arm and becomes numb. Orthopnea has been present for the past year. Walking may cause spells of vertigo and nausea along with marked weakness. * * * There was marked annulus senilis in both eyes. No cardiac abnormality noted on examination; his temporal arteries were markedly thickened and tortuous. Pulsation in the posterior tibial arteries was weak. The right eye had an early cataract. My diagnosis is arteriosclerotic heart disease with anginal syndrome, paroxysmal tachycardia and paroxysmal nocturnal dyspnea,

Grade 3–C. I didn't feel it was necessary to take an EKG * * *."

The record also contains a letter from Dr. Nichols, M.D., to Dr. Oser, dated March 4, 1958. Dr. Nichols found that the heart had "Regular sinus rhythm. A2 was greater than P2. Left border of cardiac dullness 4cm. from the midsternal line 5th interspace * * *." Under the heading "Impression" Dr. Nichols commented:

"1. Cardiac arrhythmia, etiology undetermined.

"2. Possible post necrotic cirrhosis compensated."

Because of the anxiety neurosis mentioned in the reports of the other doctors, the patient was examined by a Dr. W. A. Massie, M.D., whose letterhead also shows him to have been a psychiatrist. The record shows that this examination lasted less than one-half hour. (Tr. 050.) Dr. Massie said, "It is the impression of this examiner that this patient is well oriented, has a clear sensorium and shows no gross evidence of psychotic determinants. He is not incapacitated on a psychiatric basis. * * * His only psychiatric symptom is that of some 'nervousness and shakiness' which is not incapacitating in itself."

On August 19, 1957, the applicant applied for vocational rehabilitation, but was not accepted because of the medical prognosis. No elaboration was given.

The transcript of the proceedings before the hearing examiner provides a fairly complete indication of the applicant's daily regimen, and of what he believes his capabilities to be. He lives in a house that is made into apartments, with three rooms down and one bedroom upstairs. (Tr. 035.) He goes up and down stairs two or three times a day. There is a lawn and a garden around the house, but he does nothing to care for either. (Tr. 036–037.) About once or twice a week he drives his daughter downtown in her car and brings it back to his house. (Tr. 038.) He walks downtown about once a week (no more than 10 blocks total, going down and return).

(Tr. 037.) By the time he gets back to the house he can't get his breath. (P. 038.) He walked the four blocks from his home to the Post Office where the hearing was held. (Tr. 036.) He climbed two flights of stairs to the hearing room, by taking his time and resting, and was "winded" when he got to the top. (Tr. 043.)

▉ The Government places great stress upon the statutory injunction that "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *." 42 U.S.C.A. § 405(g). However, in considering what is substantial evidence, a court can look only to the record. By law, a hearing examiner occupies both the position of examiner and judge. When, as in this case, the examiner forcefully assumes the role and questioning techniques of a prosecutor but omits the techniques of a plaintiff's advocate, although the applicant appears without counsel, the record must be examined with great care. In determining whether there is substantial evidence to support the Secretary's conclusion, the Court must ascertain what facts and inferences favorable to the Government have been developed with calculated emphasis, while the corresponding facts and inferences favorable to the plaintiff have been belittled or passed over entirely.

At the commencement of the hearing this applicant was assured that independent consideration would be given his case. The examiner emphasized that he was not employed by the Bureau which had rendered the first adverse determination. However, the record of the hearing reveals that his conscious methodical questioning was designed to strengthen every facet of the Bureau's position, while his cross examination of the applicant was designed to place "loaded" phrases in the applicant's mouth and to belittle the allegations to which he clung. The following are illustrative of numerous exchanges which appear in the record. At page 043 the applicant testified:

"A. * * * my heart will run 125–130 beats a minute and if I go out and exert myself in any way and

lift anything why they'll start—my heart—all over again. Any time I exert myself in any way—even walking upstairs does it.

"Q. You walked up these two flights of stairs and of course, you were winded when you got up here, but you made it.

"A. I got up here all right but I take my time and rest.

"Q. But you didn't have to slow down and stop at every step until you got here?

"A. No, I didn't run up them or anything like that."

And, at page 051, in a discussion of electrocardiograms:

"Q. Did the doctor tell you what they showed?

"A. No, he didn't—they didn't tell me what it showed.

"Q. They were normal—you know. I know you are glad to hear that they were normal."

However, in spite of his zeal to prove that the applicant was in better health than he claimed, the hearing examiner left an almost barren record insofar as facts concerning the applicant's employability were concerned. As to this important inquiry the record consists only of the following evidence:

1. The reports of Dr. Brown that from April of 1955 he had advised the patient not to work. (It should be noted that the claim examiner's report stated that Dr. Brown had told him that the patient could do light work such as a watchman's job.)

2. The report from Dr. Brown that the applicant was 100% disabled.

3. The reports from Dr. Heringhaus that he had not advised the patient not to work, coupled with the later statement that the patient appeared to be about 80% disabled. (Note that the applicant thought Dr. Heringhaus had advised him not to work. (Tr. 051).)

4. The applicant's statement that Dr. Biddle had ordered him not to work in July of 1955.

5. The applicant's statement that he was unable to work or to be physically active except for some very restricted walking and driving.

6. The rejection of the applicant for vocational rehabilitation because of his medical prognosis.

■ The record is absolutely barren of any evidence that at any relevant time there was available to the applicant any job of which he was physically capable, considering the circumstances of his health, education, age, work experience, and past physical and mental activities. Without such evidence the determination of the Secretary that the applicant was not disabled cannot be allowed to stand. Hall v. Flemming, 289 F.2d 290 (6th Cir., 1961); Roberson v. Ribicoff, 299 F.2d 761 (6th Cir., 1962); King v. Flemming, 289 F.2d 808 (6th Cir., 1961); Kerner v. Flemming, 283 F.2d 916 (2nd Cir., 1960); Erickson v. Ribicoff, 305 F.2d 638 (6th Cir., 1962); Holbrook v. Ribicoff, 305 F.2d 933 (6th Cir., 1962). See also Butler v. Flemming, 288 F.2d 591 (5th Cir., 1961).

As the Sixth Circuit Court of Appeals said in Roberson v. Ribicoff, 299 F.2d 761 (1962):

"The administrative decision in this case does not measure up to our adopted standard. Not only was there no substantial evidence to show that appellant could engage in some substantial gainful activity; but, also, there was no evidence that employment was available to appellant in those fields of endeavor which the hearing examiner found him capable of handling. In fact, all the evidence points to the conclusion that appellant cannot engage in any substantial gainful work; and it is mere speculation to say that he can get a job as a furniture repairer * * *." (P. 763.)

As the Second Circuit Court of Appeals said in Kerner v. Flemming, 283 F.2d

916, 922 (1960), approved and followed by the Sixth Circuit in Hall v. Flemming, 289 F.2d 290 (1961), "It should not be hard to provide better medical evidence as to what work plaintiff can and cannot do, and the Secretary's expertise should enable him readily to furnish information as to the employment opportunities * * or the lack of them, for persons of plaintiff's skills and limitations."

■ The case will be remanded to the Secretary, pursuant to 42 U.S.C.A. § 405 (g), for further findings of fact as to whether, at the relevant times, there were any actual employment opportunities available to the plaintiff which he was reasonably capable of accepting in view of his educational background, his work experience, and his physical condition. In the absence of substantial evidence of such opportunities, he will be entitled to the determination of a period of disability and to disability benefits as applied for.