ÁNGELA RODRÍGUEZ ORTIZ, Petitioner, *v.* INDUSTRIAL COMMISSION OF PUERTO RICO, ETC., Respondent.

No. CI-63-16.    Decided June 29, 1964.

*Virgilio Brunet* for petitioner. *Donald R. Dexter, José R. Martínez, Miguel A. Guzmán Soto,* and *Aura Nélida Pérez* for the Manager of the State Insurance Fund.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Appellant's physical condition and health were set forth by the Industrial Commission in its resolution of September 13, 1963, which is now on review, in the following manner:

"The injured party testified that she is a specialist in cooperatives and works for the Cooperative Development Admin-

istration with a salary of $375 monthly; that at the present time she is on sick leave; that she does not feel well: she has palpitations, frequent fatigue, she feels sharp pains and takes Nitroglycerin, and also Persantin, Librium and others; that she has been examined by Doctors Suárez, Soltero, Medina, Coca Mir and from the State Insurance Fund by Dr. Timothee; that when she went to Dr. Timothee he recommended that she stay at home, take it easy, keep calm and not to worry, but that notwithstanding Dr. Timothee's recommendations she returned to her work, and she could not work.

"On questioning by the insurer's representative the injured party reported that when Dr. Timothee examined her and awarded her 40 percent disability, she was feeling very ill, she felt sharp pains, dizziness and acute pain in her heart, that when she went to Dr. Coca Mir she felt the same symptoms but more frequently and still feels the same at the present time.

"Dr. Rafael Coca Mir testified that he is a surgeon and a specialist in internal medicine and cardiology; that he examined Ángela Rodríguez on August 1, 1963 when she was referred to him by his colleague for a cardiovascular test; that from her record and his findings, since he did not know the patient previously or had treated her, he found she was a woman 54 years old, who apparently worked for many years as specialist in cooperatives with the Cooperative Development Administration and she alleged that during working hours on June 24, 1962, suddenly she felt a pain in the precordium, palpitations, dizziness, fatigue and cold perspiration; that she was taken to her home where she was confined for three months and treated by a cardiologist; that on September 3, 1962 she returned to her job and her doctor's diagnosis at that time was severe ischemia of the miocardia; that he had a note that at the commencement of this condition she had a left heart failure but that she improved with digitalis and was also treated with coronary vasodilators; that among other things he saw, as he says, that the case was not submitted to the State Insurance Fund immediately; but in February 1963 the case was accepted by the Fund and connected with her work; and on September 3 she returned to work; that she continued in her work, but she says that she continued to feel precordial pains when doing moderate exercise, often reflected in the neck, for which she took Nitroglycerin and sat down for a while, rested and the pain ceased

and returned; that according to the patient in January 1963 she suffered again an acute attack of severe dyspnea, severe pain in the precordium and palpitations, and she confined herself at home for a month; that on February 16 she went back to work on the same kind of work and continued in said work until April 22, 1963, when, according to her, she was obliged to discontinue the work because of the severe and more frequent pain, now produced by light exercise such as walking a distance of half a block on level ground; that since then she has stayed at home, she is confined to her home because the symptomatology described occurs very often caused by exercise, that she does not do housekeeping and leads an absolutely quiet life.

"That from a physical examination she appears to be a somewhat dyspneic woman, with somewhat swollen eyelids, which may be a personal characteristic and may not be related; she weighs 125 lbs. and is 5 feet tall; the blood pressure on the day of the physical was 170/100 on both arms, the pulse was 100 per minute and regular, respiration 30 per minute; small bilateral medial pterygiums; a funduscopy revealed grade II arteriosclerotic changes without hemorrhage, no swelling appeared, some enlargement of the veins of the neck, but the hepatojugular reflex was negative, the chest was symmetrical; fine, humid stertors appeared in the fundus of the lungs, posterior, fine stertors, not coarse stertors; the heart was not enlarged, the cardiac murmurs were regular but fast; the second aortic murmur considerably stronger than the second pulmonary murmur; there were no murmurs, the abdomen was somewhat fat, the liver palpable at 2 cm. in the upper part of the abdomen on the right side, not painful and soft; the spleen was not palpated; the genitalia was not examined; the extremities as to their mechanical conditions, were normal, but her feet were very cold; dorsalis pedis pulsations were present but quite weak, the neurologic examination was normal, the electrocardiogram revealed generalized changes in segment ST and the wave T indicative of diffused ischemia of the miocardia.

"The expert added that he had the impression that it is a case of arteriosclerotic organic sickness of the heart with sinusal rhythm, decompensated coronary insufficiency class III-C; that these cases of decompensated coronary insufficiency with the spells which suggest left failure should be considered defini-

tively as coronary thrombosis; that if the history of the case is considered true and on the basis of certain events which are common in serious coronary disease, said cases of persistent insufficiency should be considered as cases of infarct and where the prognosis is reserved and where light exercise is recommended to the patient; that actually the patient is disabled for any kind of work which requires physical exercise other than the most quiet and mental activities other than the most peaceful.

"Upon being questioned by the Commission he stated that in his opinion said patient was disabled except for the most sedentary work, that if the insufficiency and pain are controlled in this lady, she could perform very quiet and peaceful work; that a person with uncontrolled insufficiency, under proper treatment, is considered totally and permanently disabled for any kind of work; that if the patient's insufficiency is controlled to the minimum exercise, he may exercise, but that going to the office to work under pressure is not the same as walking a block around the house, it is not the same as to do exercise free from emotional pressure; that he agrees that the patient may exercise herself, but not under pressure; that a patient suffering persistent angina, an insufficiency phenomenon, may little by little develop a certain type of exercise which is good for him.

"The expert continued to report that with the symptoms of persistent insufficiency which apparently show no improvement with the proper treatment, he would say that the injured party should not hold a position where she has duties; that he has no experience in estimating the percent of disability; that if with a more adequate treatment than the one the patient has had the angina or insufficiency disappears to light exercise, the disability varies; that whether it is permanent or not, he does not know because he is reporting about what he found on August 1, 1963 when he examined her; that this was the only time he had examined the patient and that at that time she could not perform any kind of work and was totally and completely disabled. That in his opinion due to the different acute attacks the patient has had and as shown by the electrocardiogram, she possibly has severe coronary arteriosclerosis which requires therapy of physical and mental rest to a minimum of exercise but ambulatory; she need not be confined in bed.

"Upon questioning by the insurer's representative the expert reported that he classified said injured party in class III-C, that in this group she is confined to ambulation not related except to the slightest possible exercise and sedentary occupation; that he did not classify her in group IV because it requires a heart condition at a much more serious stage than hers and the patient has to remain in bed; cannot get up more than once a day and take a ride in a wheel chair, but in this case there would have to be an attack; that said patient may keep in ambulation and sedentary movement around the house.

"Upon questioning by Dr. Simonet he reported that the precordial pain may be mistaken with the pain of the cervical disks.

"Dr. Jacobo Simonet testified that he is a specialist in diseases of the chest and lungs; that he has never examined the injured party but that he has heard about the medical reports and the testimony of Dr. Coca Mir; that in this case Dr. Timothee awarded the injured party 40 percent incapacity in accordance with the American Heart Association, that is, she was classified in group II, in which disability varies from 20 to 40 percent, it is required that the heart be partially compensated; that there being no infarct of the myocardium, actually, the heart disease cannot be classified as exceedingly serious according to the symptomatology of angina pectoris that in spite of the time elapsed it has not degenerated to infarct of the myocardium nor coronary thrombosis; that the patient sometimes complains of pain and she has no fatigue notwithstanding the fact that she is not working and she is moving around and there are no malleolar edemas, the pain is something subjective, that, as the doctor said, it could be mistaken for a defect in the fifth and sixth cervical vertebras and with many other things; that according to the doctor's report arterial pressure of 170/100 and the pulse 100 are good.

"The expert continued testifying that he does not agree that the patient is totally and permanently disabled for work and that, on the basis of the report that there is no infarct of the myocardium, there is only coronary insufficiency, he is of the opinion that the percentage has not increased, that 40 percent is fair and she fully enters into group II. The doctor added that the patient can work although not in the same work that she performed before, and that the work must be limited.

"Upon questioning by Mr. Brunet as to whether he could guarantee that the patient could return to her work without running the risk of death, the expert answered that not at the work she was performing before, that the work must be limited according to the disability awarded, which is 40 percent; that in this case the patient was examined by Dr. Timothee, who made a study and rendered a diagnosis of angina pectoris, that there are exceptions in which the infarct is not revealed in the electrocardiogram, but that most of the times it is; that in his opinion the patient should continue in a job and rehabilitate herself and that the treatment in this case should be provided by a cardiologist, a specialist.

"Dr. Abel de Juan testified that his specialization is internal medicine and cardiology; that he has examined the record and listened to the discussions of Dr. Simonet as well as of Dr. Coca Mir. That in his opinion the case of said injured party falls under classification III of the table as established by the American Heart Association, and said classification comprises a disability of 50 to 70 percent. That specifically, there is no evidence of coronary thrombosis in the patient, but of a coronary disease with angina and coronary insufficiency, heart failure has occurred which has reacted to treatment, excessive fatigue is manifest and there is no bimalleolar swelling; the injured party alleges she feels anginous pain when she walks more than a block on level ground, and that taking all these factors into consideration his opinion is that she presents a disability of 60 percent of the loss of the general physiological functions, that said disability refers to the industrial disability of said person."

Pursuant to the foregoing it decided the following:

"The injured party's allegations having been heard and the medical testimony analyzed WE DECIDE that the injured party presents a disability of 80 percent of the loss of the general physiological functions, and hence WE ORDER the insurer to pay the corresponding compensation according to law."

The fact that the Industrial Commission, after having heard and weighed the medical evidence, decided in this case the petitioner's disability, consisting in the loss of 80 percent of the general physiological functions, shows that the Com-

mission accepted the expert testimony of Dr. Coca Mir and his medical conclusions.

The problem before us, as before the Commission, is to decide whether the petitioner, due to her heart disease and with the psysiological capacity which she still has, according to the medical testimony accepted, is *partially* or *totally* disabled pursuant to the provisions of the Workmen's Accident Compensation Act, Act No. 45 of 1935, and the norms of law which govern under said statute. The petitioner maintains that she is totally disabled.

Section 2 of said Act provides that its provisions shall be applicable to all such workmen and employees working for the employers covered by the same, who may suffer injury *or are disabled,* or lose their lives by reason of accidents caused by any act or function inherent in their work or employment, when such accidents happen in the course of said work or employment. The petitioner's case was considered as an accident of work by the competent authorities. Section 3 of the Act provides: "The total and permanent loss of industrial vision in both eyes; the loss of both feet at or above the ankle; the loss of both hands at or above the wrist; the loss of one hand and one foot, total mental disturbances which are incurable and such injuries as result in the total and permanent disability of the workman or employee *to engage in any kind of remunerative work or occupations, shall be considered total disability."* (Italics ours.)

■ According to the rule provided by § 3 of the Act that petitioner's disability by reason of her heart disease constitutes permanent total disability or just a permanent partial disability depends on the degree of ability she still has, considering a series of factors and circumstances, among them, the nature of her disease and the fact that she is a woman, to do any kind of work or *remunerative* occupations.

■ The problem involves two considerations: (1) the worker's physical impediment and its extent, measured and

expressed from the medical point of view in terms of the loss of the general physiological function, and (2) the effect of said physical impediment on the ability of the laborer or worker to perform a gainful employment. The latter involves a legal concept weighed and expressed by the worker's degree of industrial acquisitive capacity, or his capacity to earn his living.

■ The Supreme Court of Minnesota, construing a provision of its worker's compensation act which, as § 3 of our law, defines total disability as: "Any other injury which totally incapacitates the employee from working at an occupation which brings him an income" . . ., it stated in *Berg* v. *Sadler*, 50 N.W.2d 266, 269, that under said provision, although an injured person may be able to perform some part of an occupation, nevertheless, from a legal point of view, he may be regarded as totally permanently disabled if he cannot perform the substantial and material parts of some gainful work or occupation, in other words, that where the services he can perform are so limited in quality, quantity, or dependability that a market for them does not exist, he may well be classified as totally disabled. In said case the worker's both feet and ankles were injured and after receiving medical treatment he was awarded a permanent *partial* disability of 40 percent to the left foot and ankle and a permanent *partial* disability of 75 percent to the right foot and ankle. The Supreme Court of Minnesota stated that it is true that employee has performed some work after the accident, which was not a continuous or steady employment and was performed by employee under great pain and suffering, but this factor would not necessarily disprove total permanent disability. His limited capacity to earn money occasionally may not lessen, from a legal concept—Minnesota states—the criterion of permanent total disability under the statute. The fact that said worker may perform services while sitting, such as that of an elevator operator, the

Court stated, was somewhat speculative because the evidence did not show that said job had been offered to him and furthermore, that he could perform it without any sufferings.

■ In another case in which the worker fractured his sixth and seventh cervical vertebrae, with a displacement of the sixth vertebra forward he was awarded a permanent *partial* disability of sixty degrees, applying another provision, similar to ours, of their workers' accident compensation law, the Supreme Court of Washington in *Kuhnle* v. *Department of Labor and Industries*, 120 P.2d 1003, stated in an illustrative and well founded opinion referring to the test of total disability in workmen's compensation acts, that although the courts have found great difficulty in defining what is meant by incapacity "to perform any work at any gainful occupation," the Courts, nevertheless, agree that they do not mean that the workmen must be absolutely helpless or physically broken and a human wreck for all purposes except merely to live. The Court stated that the purpose of the act was to insure against loss of wage earning capacity and that said wage earning capacity may be completely destroyed or annihilated though the worker still has some capacity to perform minor tasks. Citing from *Green* v. *Schmahl*, 202 Minn. 254, 278 N.W. 157, it is stated that a much limited capacity, sporadic competence, occasional, intermittent, to earn something somehow, does not reduce what is otherwise a total to a partial disability. The court commented that the fact that the worker, in said case, possessed a small business or farm from which he could derive some income supervising the work of others or performing light tasks himself, did not necessarily prove that he had the capacity to earn a salary.

Citing from *Moore* v. *Peet Bros. Mfg. Co.*, 99 Kan. 443, 162 Pac. 295, states that the statutory provision "total inca-

pacity for work" does not imply an absolute disability to perform any kind of labor; that it required a practical and reasonable interpretation, as is illustrated by the family rule that inability to obtain work, caused by an injury, is classed as total incapacity; and that the impossibility to perform the usual tasks of a workman in such a way as to enable him to procure and retain employment is ordinarily sufficient cause to regard the worker as totally incapacitated.

And see, applying similar provisions, for similar purposes and ends, of the Social Security Act of the United States:[1] *Pollak* v. *Ribicoff*, 300 F.2d 674 (2d Cir. 1962); *Meola* v. *Ribicoff*, 207 F. Supp. 658 (1962); *Underwood* v. *Ribicoff*, 298 F.2d 850 (4th Cir. 1962); *Rinaldi* v. *Ribicoff*, 305 F.2d 548 (2d Cir. 1962); *Lawrence A. Ferran* v. *Flemming*, 293 F.2d 568 (5th Cir. 1961); *Kerner* v. *Flemming*, 283 F.2d 916 (2d Cir. 1960). See, construing similar concepts of the federal Act of War Risk Insurance: *Berry* v. *United States*, 312 U.S. 450; *Lumbra* v. *United States*, 290 U.S. 551.

■ According to the authorities and the doctrine generally accepted, the fundamental test to decide whether a worker is totally incapacitated is his ability, after the injury or accident, to work continuously at a gainful occupation. Returning to the record of this case and the evidence accepted by the Commission, it is evident the petitioner is neither physically capacitated to continue performing the work she was performing when she became disabled, nor is she capacitated to engage in another gainful occupation or work within the meaning and scope of § 3 of the law. She has a residual physical ability of her general physiological functions of 20 percent, which permit her to live and do certain things, but according to the record, her industrial

---

[1] 42 U.S.C.A. § 423.

capacity has disappeared in her, that is, her capacity to earn a salary or engage in a gainful occupation.

Under appellant's circumstances and considering the nature of the disease, her physical impediment of 80 percent of the loss of her general physiological functions constitutes total incapacity.

The decision of the Industrial Commission will be modified in the sense that it will provide that the loss of 80 percent of the general physiological functions which the Commission determined, is equivalent in her to a permanent total disability in respect to her compensation, and as thus modified it will be affirmed.