Solomon **SPIVAK**, Plaintiff,

v.

John W. **GARDNER**, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 63–C–1132.

United States District Court
E. D. New York.

Dec. 6, 1966.

Solomon Spivak, pro se.

Joseph P. Hoey, U. S. Atty., Brooklyn, N. Y., for defendant; Ronald G. Wohl, Asst. U. S. Atty., of counsel.

MISHLER, District Judge.

This is an action pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health, Education, and Welfare denying plaintiff's application for the establishment of a period of disability, and for disability insurance benefits. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendand moves for summary judgment on the ground that the denial of benefits is supported by substantial evidence.

Plaintiff was born in Russia on June 30, 1898, and was naturalized as an American citizen in 1926. He stands about 5'4" tall, weighs about 185 pounds, and presently is receiving $59.70 per month in old-age benefits. His wife receives $33.20 per month.

### Procedural History

On May 1, 1961, at the age of 62, plaintiff filed an application for the establishment of a period of disability under 42 U.S.C. § 416(i) (Supp. I, 1965), and disability benefits under 42 U.S.C. § 423 (Supp. I, 1965), alleging that an arthritic condition rendered him unable to work since September, 1957. When the local office informed him that according to his earning records he had last met the special insured status of the Act on September 30, 1955, plaintiff amended his application by claiming that he had actually become disabled early in 1954.

On August 10, 1961, the Bureau of Old-Age and Survivors Insurance (now the Social Security Administrator, Department of Health, Education and Welfare), denied plaintiff's application on the grounds that the consultative examination failed to suggest that his impairments were severe enough to render him incapable of engaging in substantial gainful activity, and that even if plaintiff was then disabled, there was no indication in his file that he was disabled as of September 30, 1955. The Bureau reconsidered its decision pursuant to plaintiff's request, but on November 22, 1961, it affirmed its denial of his application. The Chief of the Payment Center, one Mr. Charles M. Lunz, ex-

plained the Bureau's action in a letter to plaintiff, which said in part:

> The medical evidence, including the special examination in July, 1961 shows that you have a varicose veins condition. However, there is no indication of any severe involvement of the circulation and no limitation of motion. While your impairment may cause you some pain and discomfort, the evidence does not show that your condition is sufficiently severe to prevent you from engaging in some type of substantial gainful activity at a time when the earnings requirement was last met.

Thereafter plaintiff continued to pursue his administrative remedies by filing a formal request for a hearing. One was held on November 6, 1962 before Lawrence P. Ashley, a Hearing Examiner for the Social Security Administration. In an opinion dated November 29, 1962, the Hearing Examiner also denied plaintiff's application, asserting that plaintiff's medical impairments fell " * * * precipitously short of the severity of the standards prescribed by statute." Record, p. 18, Hearing Examiner's Decision. After remarking that plaintiff had "meagre" annual wages from 1947 through 1950, at a time when he was only about 50 years old, the Hearing Examiner added:

> Every right implies a responsibility; every opportunity an obligation. It was the intent of the Congress that only those individuals who have been diligent workers, those people who have had significant earnings through the years, and are subsequently precluded from working for reasons of severe medical impairments, are to be afforded the relief provided for in the "disability" provisions of the statute. Id. at 17.

When the Appeals Council of the Bureau of Hearings and Appeals denied plaintiff's request for a review of the Hearing Examiner's decision, that decision became the final decision of the Secretary of Health, Education, and Welfare, and thereby subject to review by this Court under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (1964). Since plaintiff subsequently was awarded benefits before he attained the age of 65, it must have finally been determined that he was disabled, at least as of August 17, 1961. See 42 U.S.C. §§ 402(a) and 414(a) (1) (B) (1964); Record, p. 49, Transcript of hearing. Thus, the relief plaintiff actually seeks is a "disability freeze," i. e., the elimination of the years 1955–61 from his earnings record, so that such period is not considered in determining his average monthly wage, upon which the amount of his benefits is based. In order to be entitled to such relief, he must show that during those years he was unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. See 42 U.S. C. § 423(c) (2) (A) (Supp. I, 1965). In other words, the crucial issue before this Court is whether or not there is substantial evidence to support the Hearing Examiner's finding that plaintiff was not disabled as of September 30, 1955.

The record indicates the following:

### Vocational History

Plaintiff completed grade school, a fraction of a term of evening high school, and a course in sheet metal work. He worked as a sheet metalist for less than a year, after which he operated sewing machines in a bed quilt factory from 1920–22. Following two years in the grocery business, he began work as a painter of apartments and the interiors of buildings. He remained at that occupation from 1923–41. Then in 1942, plaintiff again operated sewing machines, this time sewing epaulets and collars on Army uniforms. He reverted to painting for one year, and then operated a blind-stitch machine in a factory producing Eisenhower jackets. The latter job lasted until about late 1953, and from that time until August, 1957, he did not work, allegedly because of health reasons. For most of that period, his wife worked, however, and her income, plus four cashed-in insurance policies, supported the family. Plaintiff failed to file for

either disability benefits or unemployment insurance.[1]

In 1957, plaintiff got a job as a general handyman for an old people's home and hospital. There he did maintenance work: painting, plumbing, minor electrical repairs, nailing floors, etc. Plaintiff testified that he worked hard, but that his legs bothered him, and that he developed blotches on his knees. His wife added that his legs got worse from standing, and that it was difficult for him to get back and forth to work. Record, p. 23, Transcript of hearing. Furthermore, a letter from the hospital's executive director, dated June 11, 1963, stated that plaintiff was forced to leave its employ " * * * because of a bad leg condition." Record, p. 142, letter of Millie Felder. The Hearing Examiner, however, tersely concluded that " * * * one day he [plaintiff] decided to quit because he had to do too much kneeling." Record, p. 14, Hearing Examiner's decision.

After leaving his maintenance job, plaintiff no longer worked, although he apparently was able to attend to his personal needs and do some housework.

*Medical History*

Abundant evidence in the record supports the conclusion that plaintiff has not been in good health for many years. He has suffered from a severe case of varicose veins, at least since 1945, when he first underwent a varicotomy. In addition, letters from two of plaintiff's co-workers, Mr. Joseph Glickson and Mr. Anthony Calla, support his contention that sometime after the surgery the pain in his legs returned, and that his work was affected by an apparent circulation problem. Record, pp. 143, 144.[2]

Plaintiff received outpatient medical care at the Sidney Hillman Health Center from May, 1952 to May, 1955. His condition was diagnosed as follows: arteriosclerotic heart disease; obesity; varicose veins of the legs; calcific peritendinitis in the right shoulder; arteriosclerotic and hypertensive fundus changes, Grade I and II. Treatment consisted of a reducing diet, vitamins, heat, exercise, and radiation therapy for the right shoulder. Records, pp. 117, 119, Medical Reports. Furthermore, he saw Dr. Simon Schwarz for a short time in 1954, and was at the University Heights Hospital for three days in 1955. It was apparently at that time when plaintiff again had surgery performed on his legs, and the Bureau's consultative physician, Dr. Joshua Rubinstein, characterized the results as "poor". Record, p. 77, letter of Joshua Rubinstein, M.D.

From 1955 until 1959, however, plaintiff apparently received no medical treatment. Then in 1959 he attended the outpatient clinic of the Coney Island Hospital about five times. Apparently plaintiff was again bothered by pains in his legs, and the hospital's records indicate that he limped while walking. Record, p. 118, Medical Report. He was again an outpatient at the University Hospital in 1960–61, and he began seeing one Dr. Israel Fleiss in June, 1960. Dr. Fleiss diagnosed plaintiff's impairments in the following manner: obesity; severe varicosities; hypertension; arteriosclerosis of both lower extremities due to varicosities. Moreover, Dr. Fleiss stated that the status of plaintiff's condition was unpredictable, and that he believed that he had been disabled since about 1958. Record, pp. 69–70, Medical Report of Israel Fleiss, M.D. It should be noted that this estimate was given before plaintiff amended his application to claim a disability since 1954, rather than 1957.

In 1961, Bellevue Medical Center reported to the Social Security Administration that plaintiff had been complain-

---

1. Plaintiff testified at the hearing that he didn't want to look for charity, and that in any case, it was his understanding that unemployment benefits are unavailable if one is unable to work. Instead, plaintiff tried to accumulate enough money to go for surgery. Record, p. 43, transcript of hearing.

2. These letters were not filed until June 23, 1963.

ing of pains in his legs, especially in his calves and ankles, for approximately five to six years. This report also predated the amendment of plaintiff's application, and shows since 1955 he had suffered the same kind of pain with which Dr. Fleiss was concerned. Record, p. 71, Letter of Jean C. Kemp, Supervisor, Out Patient Dep't. Bellevue's examination, conducted in 1960, revealed varicosities in both legs, obesity and emphysema. Plaintiff was referred to the Vascular Clinic, which found mild A.S.O., varicose veins, and osteoarthritis and peritendonitis in his right foot. He was then sent to the Arthritic Clinic, whose examination revealed an obese, plethoric male with a marked degree of bilateral varicose veins. In the examiner's opinion, plaintiff's leg cramps were due to his varicose veins. Ibid. In a supplemental report, Miss Kemp indicated that the Medical Center had advised him to undergo another operation. Record, p. 72, Letter of Jean C. Kemp, Supervisor, Out Patient Dep't.

In July, 1961, at the request of the Bureau of Disability Determinations, plaintiff was seen by Dr. Joshua Rubinstein. The doctor reported that plaintiff suffered from hypertension, a marked degree of bilateral varicose veins in both legs, perhaps some mild arthritis in the right shoulder, and albuminuria, which may well have been due to nephrosclerosis. Record, pp. 73–79, Report of Joshua Rubinstein, M.D.

Plaintiff underwent a bilateral ligation and stripping for his recurrent varicose veins on January 5, 1962. The operation appeared to be successful, and as of June, 1962, plaintiff had no complaints referrable to his legs, although an occasional vein was prominent. Record, p. 90, Report of Bellevue Medical Center.

He returned to Dr. Schwarz's care in March, 1962, and as of December 8, 1962, plaintiff's condition was diagnosed as follows: hypertensive arteriosclerotic heart disease; obesity; arthritis of the spine; status of legs—peripheral vascular disease. The doctor added: "I do not think that the condition can be removed by any medical means. However, a strict reducing diet was urgently advised but apparently ineffective." Record, p. 116, Letter of Simon Schwarz, M.D. He also indicated that he believed that plaintiff had been disabled since 1957. Record, p. 104, Medical Report of Simon Schwarz, M.D. In a later report, however, dated April 26, 1963, Dr. Schwarz indicated that plaintiff's condition was progressively worsening, and that he had probably been disabled since 1954.

### Discussion

The Hearing Examiner's decision appears to have been based on two general impressions: first, that plaintiff was not a hard-working, productive member of society; and, second, that plaintiff should have been able to withstand the pain resulting from his medical impairments and gone to work.

To support the former point, the Hearing Examiner relies on plaintiff's earning record from 1947–61. Yet plaintiff had been working for many years prior to that date, and it is clear that as he grew older, he was beset by more severe medical impairments. In any case, the question before the examiner was not whether plaintiff was a good provider for his family, but rather whether or not he was disabled as of September 30, 1955. See 42 U.S.C. § 423(c) (2) (Supp. I, 1965).

The latter point is more complex, however, because we have no way to calibrate pain. Nevertheless, the Hearing Examiner seeks to support his determination by citing certain circumstantial evidence in the record. First, he points to plaintiff's maintenance job in 1957 as proof that plaintiff's idleness was not proximately caused by his impairments. A more reasonable inference, in the light of the medical history, the testimony of plaintiff's wife, and his employer's

letter is that he was physically unable to continue working.[3]

Second, the Government argues that the fact that plaintiff did not seek medical treatment from 1955–60 shows that his condition did not require continuous treatment, and did not restrict his ability to ambulate. Plaintiff never claimed that he was not able to walk, however, only that he had severe pains in his legs which made it impossible for him to hold down a steady job. In 1955 he had just undergone his second operation, and his difficulties in 1957 show that the pain, at least in his own mind, continued. Dr. Rubinstein's conclusion that the operation had poor results, and the evidence that plaintiff's physical condition has gotten progressively worse since 1945, tends to dull the Government's argument.

■ Third, the Government asserts that since plaintiff's primary occupation was that of a sewing machine operator, a "sitting-down job," he could have pursued his work when the factory closed in 1953. The Hearing Examiner stressed that such jobs are readily available in the garment industry,[4] and that at no time was plaintiff "handicapped by impairments of such severity as to completely nullify his economic potential." Entitlement to benefits, however, does not require plaintiff to meet such a severe test. See Kerner v, Flemming, 283 F.2d 916, 921 (2d Cir. 1960). Furthermore, plaintiff's fellow employees have stated that he was in severe pain, and that an apparent circulation problem prevented him from sitting for very long. His wife also testified that he had trouble getting to and from work, and a claudation, or limp, had been observed by several doctors. In addition, at 56 years of age, plaintiff could hardly have been expected to withstand the same degree of pain and discomfort as when he was a younger man.

And finally, the Government points to the fact that plaintiff and Dr. Schwarz first claimed that the disability arose about 1957, rather than 1955, and implies that the claim was conveniently changed only after the district office informed plaintiff that he must have been disabled as of 1955 in order to establish a disability period. It is clear, however, that as of 1955 plaintiff had been suffering from his leg condition for ten years, and in that year he apparently underwent a second operation. Moreover, Dr. Rubinstein indicated in a letter dated prior to the date on which he sought the amendment, that plaintiff had been complaining of pain in his legs since about 1955–56. The inconsistency is reasonably understood as a miscalculation by plaintiff before 1957 as to his anticipated physical improvement and his expectation of reemployment. His difficulties at the old-age home in that year, however, may have finally convinced him that trying to work was futile. Since plaintiff shows that he has no background as a claimant for benefits (except for workmen's compensation for a broken toe), and since his wife and acquaintances have attested to the fact that he often appeared to be working while under severe pain, the Government's implication of manipulation and bad faith is unsupported by the record.

### Conclusions of Law

■ Although the applicant for disability benefits bears the ultimate burden of persuasion, a reviewing court is not bound to sustain a denial of such benefits by the Secretary " * * * where the applicant has raised a serious

---

3. Mr. Sol Spivak, SS #082–01–5645, was employed at Menorah Home and Hospital, 871 Bushwick Avenue, Brooklyn, New York, in the Maintenance Department as a painter from August 8, 1957 to September 6th 1957. He was forced to leave because of a bad leg condition. Record, p. 142, Letter of Millie Felder, Executive Director, dated June 11, 1963.

4. Plaintiff testified that he was not very accomplished as a sewing machine operator. The factory where he worked was set up like an assembly line, and each operator was responsible for one small piece of the finished product.

question and the evidence affords no sufficient basis for the Secretary's negative answer." Kerner v. Flemming, supra at 922.

■■ The determination of whether or not plaintiff was disabled as of 1955 requires the resolution of two issues: first, what he can do; and second, what the employment opportunities are for someone who can do only what he can do. Id. at 921. The fact that there are days when plaintiff could work, does not mean that the opportunity to do so is realistically available to him; "nor does it take into account the effect of plaintiff's mental impairment upon such an opportunity." Brill v. Celebrezze, 232 F.Supp. 296, 305 (E.D.N.Y.1964).

There is no explicit statement in the medical record that plaintiff was indeed able to work in 1955. Rather, the denial appears to have been based upon an evaluation of the medical reports, plaintiff's earning record, and his physical appearance. The Hearing Examiner apparently felt that plaintiff's pain was never severe enough, and that in any case, plaintiff did not deserve disability benefits because he was never a good provider. Perhaps it has been the prevalence of similar attitudes that has led many courts in recent years to be troubled by the Commissioner's overzealousness in protecting the public funds. See Smith v. Celebrezze, 239 F.Supp. 337, 340 (W.D.S.C.1965).

Plaintiff's impairments appear to consist of more than " * * * minor aches, ailments and discomforts. * * * " Ber v. Celebrezze, 332 F.2d 293, 300 (2d Cir. 1964). From 1945–62 he suffered from a leg condition which grew progressively worse, and which required surgery on three occasions. It appears that his overall health has deteriorated to the point where he was found eligible to receive old-age benefits before the age of 65. While the medical reports may indicate that another person with plaintiff's symptoms probably would have suffered considerably less pain, " * * * it nevertheless amply supports * * * [his] complaint that in * * * [his] particular medical case these symptoms were accompanied by pain so very real to * * * [him] and so intense as to disable * * * [him]." Id. at 296.

■■ The Second Circuit has recognized that persons often have higher or lower thresholds of resistance to pain and, therefore, may react very differently to the same hardships. Indeed, even if pain is unaccompanied by objectively observable medical symptoms, it will support a claim for disability benefits if it is both real to the particular claimant, and so intense as to be disabling. Id. at 299.

The notion that pain must be endured, that pain, no matter how severe or overpowering, is not disabling unless it will substantially aggravate a condition, is contrary to the law under disability provisions of the Social Security Act which were intended to ameliorate some of the rigors that life imposes. Miracle v. Celebrezze, 351 F.2d 361, 374 (6th Cir. 1965).

■ In cases of this kind, objective medical facts and expert medical opinions can carry one only so far. The Hearing Examiner must also consider plaintiff's subjective evidence of pain and disability, and the corroboration offered by his family, friends, co-workers and employers. Mode of Celebrezze, 359 F.2d 135, 136 (4th Cir. 1966).

■ In light of recent precedents, this Court holds that the record in this case does not contain substantial evidence to support the Secretary's decision. Accordingly, the ruling below is reversed, and the case is remanded to the Social Security Administration for the entry of a judgment in favor of plaintiff consistent with this opinion. See Ber v. Celebrezze, supra.

John W. Gardner, Secretary of Health, Education and Welfare, has been substituted as party defendant in place of Anthony J. Celebrezze, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Since plaintiff appears pro se, defendant is directed to settle the judgment on two (2) days, such notice of settlement to be served within fifteen (15) days from date.