Louise SISIA, Plaintiff,

v.

Arthur S. FLEMMING, Secretary of Health, Education and Welfare of the United States of America, Defendant.

Civ. No. 20092.

United States District Court
E. D. New York.

April 27, 1960.

Samuels & Schwabinger, Farmingdale, N. Y., for plaintiff, Jules Schwabinger, Farmingdale, N. Y., of counsel.

Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y., by Ann B. Miele, Asst. U. S. Atty., Brooklyn, N. Y.

ZAVATT, District Judge.

This is a civil action brought pursuant to 42 U.S.C.A. § 405(g) to review the decision of the Secretary of Health, Education, and Welfare, denying "child's [disability] insurance benefits"[1] to the claimant, plaintiff herein. The Secretary's decision is embodied in the opinion of the Appeals Council of the Social Security Administration (hereinafter referred to as the "Administration") which reversed a decision of the referee that had awarded the benefits sought. The matter is before this court on cross motions for summary judgment. The only issue is whether the claimant is "disabled," it being conceded that the claimant has met the other requirements of the statute.

The scope of review and the powers of this court are all set out in section 405(g):

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied * * * because of failure of the claimant * * * to submit proof in conformity with any regulation prescribed [by the Secretary pursuant to law], the court shall review only the question of conformity with such regulations and the validity of such regulations. The court * * * may * * * on good cause shown, order additional evidence to be taken before the Secretary * * *."

Besides the formal applications and the decisions of the several Administration officials, the certified record consists primarily of testimony of the claimant, her mother, father, and brother, and two long-time family friends, all taken at the hearing before the referee and supplemented by answers to written interrogatories concerning the claimant's employment and home life directed to the claimant and her parents. In addition

---

1. 42 U.S.C.A. § 402(d) (1):
   "Every child * * * of an individual entitled to old-age insurance benefits * * * if such child—
   "(A) has filed application for child's insurance benefits,
   "(B) at the time such application was filed was unmarried and * * * was under a disability * * * which began before he attained the age of eighteen, and
   "(C) was dependent upon such individual at the time such application was filed * * *
   shall be entitled to a child's insurance benefit for each month, beginning with the first month after August 1950 in

which such child becomes so entitled to such insurance benefits and ending with the month preceding the first month in which * * * such child * * * ceases to be under a disability * * *."
   "Disability" is defined in 42 U.S.C.A. § 423(c):
   "The term 'disability' means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required."

there are the claimant's wage and employment records; several medical reports from various institutions and doctors, the earliest dating from 1950; a letter from the New York City Board of Education setting forth the claimant's school record; and a "report of contact" based on a personal interview with the claimant by a social worker employed by the Administration, that rehashes and evaluates much of the evidence already mentioned.

The "objective" facts that the record tends to establish are these:

The claimant, Louise Sisia, was born December 19, 1913. It is undisputed that she was mentally retarded since childhood. Louise left school at age fifteen on a doctor's certificate, being unable to cope with, or adjust to, school life. Her chief complaints or symptoms were headaches and nausea. She was then in the fourth grade.

In the latter part of 1944, Louise secured a job with the Conti Shampoo Company at their Brooklyn plant. This was her first job, one previous effort having ended the day it began because Louise "got sick." Louise's duties on this new job were to pack shampoo bottles in cartons, and the cartons in cases. In addition, she folded and stapled cardboard to make the cartons. Louise held this job until the middle of 1948 when she left voluntarily. She was paid $32 for a five or six day week. However, she was frequently absent from work. This absenteeism was reflected in her wage record which shows that the claimant was never once paid a full quarter's wages in the fifteen calendar quarters that she worked there. During the years 1945 and 1946, her absences averaged about one day per week.

Besides the job at Conti, the claimant had nine other positions. Three of these

jobs appear to have begun and ended during the third quarter of 1947, a quarter in which Louise earned $89.25 from Conti.[2] In these three jobs she was paid $12.60, $4.95 and $3.90, respectively. In the other six jobs, she earned from a low of $4.20 to a high of $200.04. Her last job ended in mid-1950. From the time in late 1944 when Louise took the job at Conti to mid-1950 when she left her last job, Louise earned a grand total of $4,-533.39. Aside from the jobs mentioned, Louise had no other employment, either before or after her eighteenth birthday, up to and including the present.

In May, 1950, Louise contracted pneumonia and spent ten days in Queens General Hospital. She was re-admitted to that hospital in September of that year for the same disease. She was discharged after 18 days. It was at this time that she was diagnosed as having had rheumatic heart disease, then inactive. This diagnosis was confirmed[3] in January, 1954, when she was again re-admitted because of "chest pain." After a week she was transferred to Goldwater Memorial Hospital where she stayed for an indeterminate time.

Between the second and third hospitalizations just detailed, around March, 1952, Louise suffered a "psychotic episode" involving "paranoid delusions and hallucinations which were accompanied by irritable, excitable outbursts," in the words of the medical report, or a "mental breakdown" as described by her brother. She was thereupon sent to Creedmoor State Hospital for seventeen months at which time she was released on convalescent leave and finally discharged one year later, September, 1954.

While Louise's prior conduct gives rise to an inference of mental deficiency, the medical report from this institution is the first official recognition and diagno-

---

2. There was testimony that the claimant had once been laid off at Conti, although no one could pin down the exact date and the claimant herself denied being laid off.

3. "Heart is considerably enlarged to the left with left upper cardiac contour indicative of rheumatic heart disease * *. Auricular fibrellation. Right axis shift Chest leads suggest left ventricular strain. Limb leads suggest right ventricular strain." Record, p. 84.

sis of that fact. The condition was described as originating "from birth," "idiopathic, moderate, with psychotic reaction." In answer to the question on a form provided by the Administration "Please comment on the patient's ability to * * * (3) adjust to a competitive employment situation," the hospital wrote, "Would be unable to adjust to a competitive employment situation." That evaluation dates from November, 1957 and is based on the hospital's observation of Louise between 1952 and 1954.

The record includes two other medical reports.[4] These are on forms supplied by the Administration to the claimant's family doctors.[5] Both reports deal primarily with the claimant's *physical* ailments, and are in agreement that Louise developed rheumatic heart disease during adolescence. Both doctors attended Louise only after 1950 and both advised her not to work at that time. In answer to a question concerning Louise's I.Q. or mental age, one doctor answered "Not available." The other, Doctor Kittell, answered, "It is my impression * * * not based on test * * * that pts. I.Q. is about 65%." This converts to a mental age of about nine to ten years, which is in the range classified mentally defective or feeble-minded by the recognized I.Q. tests.

When Louise was not either working or hospitalized she remained at home with her family. The uncontradicted testimony shows that Louise was always sickly [6] and was either never able, or allowed, to engage in any strenuous pursuits. Only the lighter household chores were given to her; Mrs. Sisia even considered shopping too strenuous for Louise. Although most of Louise's life was spent at home, she never learned to cook. In answer to the question, "Are you required to assist your daughter in bathing, dressing and feeding herself?", Louise's mother checked "No." The question continued: "Do you perform any other services for her because of her disability?", to which Mrs. Sisia checked "Yes." and described the services thus: "Cooking, washing and pressing of clothes. I must be with her at all times, she cannot be left alone."

Louise can read with fair comprehension and can do simple arithmetic. At the hearing, and in her interview with the Administration social worker, Louise showed a fair ability to remember names and dates [7], and her answers were generally responsive. She was able to travel by herself on public transportation to the various jobs she held between 1944 and 1950.

The Appeals Council developed all these facts in its opinion, although it was careful to preface some of its exposition with, "the claimant testified * * *" or other such remark which indicates that the Appeals Council did not necessarily find as fact everything that it discussed. The Appeals Council then concluded:

"[T]here appears to be no doubt that the claimant has been mentally

4. There is also a letter from Cumberland Hospital where Louise claimed she had been a patient in the 1930's, dated November 26, 1957, indicating no record for the claimant for the preceding ten years. Records over ten years are destroyed.

5. Louise had been treated by two other family doctors before 1950. One had died and his records could not be located. No reason is given why there is no report from the other doctor.

6. Besides the paranoia, headaches, nausea, pneumonia, and rheumatic heart disease with its attendant complications already mentioned, there is evidence of rheumatic fever, tonsilitis, high blood pressure, and a "variety of sundry children's diseases."

7. In commenting on Louise's ability, the Appeals Council stated, on the basis of the hearing transcript, that "she not only volunteered information but was able to remember dates, addresses and other pertinent information apparently better than her parents." This is an echo of the "contact report" which said, "At several points she volunteered information, she seemed to be able to remember dates and addresses with more accuracy than her parents." But "it was extremely difficult to elicit detailed information from the parents as there is a slight language barrier." Record pp. 92, 93.

retarded since childhood, but there is no evidence of record to show that the degree of impairment was severe enough to continuously prevent substantial gainful work prior to December 19, 1931 * * *. As a matter of fact, the medical evidence * * * covers only the period beginning with March, 1950 and after. In addition, the claimant has engaged in substantial gainful activity for a substantial period of time and in view of the amounts earned must have been capable of rendering substantial services."

The Government in support of its motion for summary judgment argues that the claimant has the burden of proof and that since the Appeals Council was not persuaded of Louise's disability, that is the end of the matter. Ordinarily that might be true, but the Appeals Council cannot close its eyes and stop its ears, any more than any other trier of fact can, and one of the purposes of review by this court is to see that it has not. But if we read the Appeals Council's opinion literally it would seem that it has done exactly that: "[T]here is *no evidence* of record to show that the degree of impairment was severe enough to continuously prevent substantial gainful work prior to [Louise's eighteenth birthday]." (Emphasis added). The Appeals Council's finding of "no evidence" concerning the severity of Louise's impairments could be true if it discredited all the mass of evidence I have previously outlined, including the medical reports of Creedmoor State Hospital and Dr. Kittell, or if it refused to draw any inferences favorable to the claimant. It is unrealistic to believe that the Appeals Council went that far.

The Government's brief suggests another reading of the Appeals Council's opinion that I think uncovers its true

meaning. The Government argues that by statute the claimant must furnish "such proof of [disability] as may be required", and that the regulations specify what is "required." 20 C.F.R. § 404.1501 (c) (Supp.1959) states:

"It must be established by medical evidence, and where necessary by appropriate medical tests, that the applicant's impairment results in such a lack of ability to perform significant functions—such as moving about, handling objects, hearing or speaking, or, in a case of mental impairment, reasoning or understanding—that he cannot, with his training, education and work experience, engage in any kind of substantial gainful activity."

On the basis of this regulation, the Government contends that medical tests, such as I.Q. tests, which may be required, were held to be necessary here and since the claimant failed to provide these exhibits there is "no evidence" as a matter of law, however strong other evidence may be. I believe this to be essentially the Appeals Council's position with one addition. And that is that the medical evidence, including appropriate tests, must be roughly contemporaneous with the critical statutory date—the claimant's eighteenth birthday, December 19, 1931. Otherwise the medical evaluation of 1957 based on extensive examinations during Louise's confinement in 1952, that Louise was unable to "adjust to a competitive employment situation" might support an inference that condition existed at the critical date. It would, at least, be some medical evidence of it.[8]

Assuming that this analysis accurately interprets the Appeals Council's somewhat crpytic opinion, is it sanctioned by law? It will be seen that neither the statute nor the regulations require

8. The statute does not in so many words require that the Appeals Council's decision be based solely on medical evidence and the Government has not contended that the statute means more than it says. All the statute requires is that a finding

of disability be based on medical evidence—probably enough to establish a prima-facie case. See Crooks v. Folsom, D.C.E.D.N.Y.1957, 156 F.Supp. 631, 634–635.

that the medical evidence be contemporaneous, even though, as I will assume, the regulations, with statutory authority, do make medical evidence of some kind an absolute requirement from which no deviation is permissible. I will proceed on the assumption that the claimant has produced non-contemporaneous medical evidence, but has failed to produce any contemporaneous medical test bearing on the severity and consequences of her mental deficiency. Because the Appeals Council specifically found mental impairment its decision cannot be based on lack of medical evidence to support that fact.[9] The inquiry reduces to this: Was the Administration reasonable in requiring a clinical test contemporaneous with the event?

■ In determining this question of reasonableness, it is appropriate to consider the purpose behind the general requirement as contained in the regulations. The legislative history indicates that the primary purpose of such a test is to enable the Administration to intelligently evaluate claims by converting the subjective symptoms into objective standards that can be compared with those set forth in the regulations.[10] The standard of the regulations is framed in terms of loss in every-day abilities, specifically in the case of mental impairments, the ability to reason and understand. The impairment to these abilities will be considered along with the claimant's training, education, and experience in determining the ultimate issue of disability, i. e., ability to engage in substan-

tial gainful activity. In this case there can be no doubt that as of the critical date, December 19, 1931, Louise had neither education, training, nor experience. The severity of impairment in reasoning and understanding therefore assumes special importance.

■ Returning to the issue of reasonableness, we begin with the Administration's finding that Louise is and was mentally retarded. What remains is an answer to the valid and critical questions, "how much and with what result?" Although there is no timely medical answer in the record there is an answer in the record based on objective and contemporaneous material: Louise was sufficiently retarded, both mentally and emotionally, so that she was unable to cope with a school situation and left at age fifteen, having attained the fourth grade after having been left-back several times. It therefore seems to me that the test that the Appeals Council required here would be merely cumulative and its absolute requirement under the circumstances, unreasonable. I do not suggest that the Appeals Council has to draw the inferences I have suggested, or even, necessarily, to credit the underlying evidence. But evidence there is that satisfies the statute and the regulations and there are inferences that can be drawn therefrom that would support the claimant.[11]

■ This conclusion finds support in the legislative history. Prior to 1956, a child over the age of eighteen years was not eligible for the benefits sought

---

**9.** The statute also says that the impairment must be of "long-continued and indefinite duration." The Appeals Council did not discuss this requirement but there is no doubt that Louise's impairment satisfies.

**10.** See Sen.Rep. No. 2133, 84th Cong., 2d Sess. (1956), U.S.Code Congressional & Administrative News 1956, pp. 3877, 3879:
"Lack of objectivity in determination of disability makes it both easier for the claimant to maintain, and harder for the administration to deny, the presence of qualifying disability."

There is undoubtedly a secondary purpose of preventing dishonest, false, fraudulent, or merely questionable claims. The legislative history indicates a concern lest the prospect of benefits turn physical disability into economic disability. See *ibid*. That would have been impossible in this case since the claimant could not have known in 1931 that a 1956 amendment to the 1935 Social Security Act would grant her benefits if she did not work in the interim.

**11.** Cf. Berry v. United States, 1941, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945.

here. At that time the act was amended to extend benefits to those "children" who, although over the age of eighteen, were still dependent because of a disability. Congress recognized that a "child" might be 40 years old [12] when he applied for these benefits, and that there would be some small backlog of claimants that the Administration would have to process immediately. The problem of proof that such a situation would present to the Administration was minimized:

"In the first place, there are very few cases involved in the provision for disabled child's benefits. Second, the task of determining the existence of a mental or physical impairment of the required degree of severity and permanence would not be difficult because most cases would be those of children congenitally disabled, or disabled in early childhood. In such cases school and other records showing the history of the case and evidencing the degree and duration of the disability will be available, and the lack of a work record will also be substantiating evidence of the child's disability and dependence on the insured worker."[13]

Since Louise meets these more liberal requirements it would seem that the Appeals Council was in error when it applied the general and stricter standard that would appropriately be applied to children presently under the age of 18, unless Louise's work record dating from 1944, 13 years after Louise's eighteenth birthday, deprives her of the benefits of these inferences. Clearly such a work record would be some evidence of Louise's ability to work and therefore relevant to the material fact of disability as of the critical date.[14] It would also by itself defeat Louise's claim if it amount-

ed to "substantial gainful activity." The Appeals Council found that it did and this conclusion which constituted the second and alternate leg of its decision must stand if supported by "substantial" evidence.

On the matter of Louise's employment I think that the issues can be somewhat simplified. The record shows that Louise had ten jobs: a job with Conti and nine others. Excluding Conti, none of the nine jobs lasted more than three months and the majority were for less than a week, to judge from the pay record. These nine jobs do not add up to "substantial gainful activity" and in my judgment are evidence of Louise's disability, in that they show she was unable to keep a job.[15] In any event I do not think that they add anything to the Appeals Council's conclusion which is based primarily, if not exclusively, on Louise's work at Conti. I will, therefore, disregard these other jobs for the moment and ask merely whether the employment at Conti is "substantial gainful activities" within the meaning of the act. The opposing briefs adequately present the competing views. The Government looks at the quantitive side: Louise held the job for almost four years; she earned $4,052.89 in wages; she was credited with fifteen quarters of coverage under the act; and in the words of the Appeals Council, "in view of the amounts earned she must have been capable of rendering substantial services." The claimant's brief emphasizes the qualitative: Louise did the most menial work; she was hired during a wartime manpower shortage; at best she was a marginal worker; her excessive absences indicate that she was tolerated rather than needed. The brief concludes that Louise should not be deprived of benefits merely

---

12. Louise was 44 years old when she applied in 1957.

13. Sen.Rep. No. 2133, 84th Cong., 2d Sess. (1956), U.S.Code Congressional & Administrative News 1956, p. 3882.

14. See Lumbra v. United States, 1934, 290 U.S. 551, 560, 54 S.Ct. 272, 273, 276. 78 L.Ed. 492.

15. On this point the referee wrote: "The record shows that the claimant was employed * * * for periods so short that, regardless of the reasons ascribed for the termination thereof, it can be inferred that it was found that she could not perform the duties of the jobs." Record, p. 9.

because there was one altruistic employer in New York who was willing to put up with her.

■ Were I to make a determination *de novo* I would find on the entire record, as did the referee, that Louise did not engage in substantial gainful activity and that she was disabled at the time she was 18 and continuously thereafter and was entitled therefore to the benefits she seeks here.[16] However, the scope of review given to this court precludes such a *de novo* determination. And on the present record I cannot say that the inferences the Appeals Council drew and the conclusions they reached are unsupported by substantial evidence. It seems clear to me, however, that the Appeals Council has taken too limited a view of the case. Not only is Louise mentally retarded but she is, and was before reaching the age of 18, suffering from severe physical impairments. Mental deficiency aside, there is little doubt that Louise was disabled in 1957 when she applied for these benefits by virtue of her heart ailments, and their attendant complications.[17] The Appeals Council should have considered whether her physical impairments, either alone or in combination with her mental state, amounted to disability.[18] The Appeals Council seemingly completely disregarded this potential independent ground of disability. The Government's brief explains this omission on the basis of a strict theory of administrative pleading: since Louise did not plead physical disability when she applied to the Administration for benefits, she may not prove it now.[19] Such a theory based on common law thinking has no place in administrative proceedings such as this.[20] It may be that the exertions and strains, both mental and physical, undergone by Louise in her various jobs between 1944 and 1950 substantially weakened her, shortened her life expectancy, and were in realty "impairments of capital" so-to-speak. In such a case, Louise's work record, even if "substantial" in so far as both income and services to her employer are concerned, would not necessarily establish nondisability.[21]

■ Of course, the present record only suggests these speculations, it does not compel them as conclusions. But in the interest of substantial justice I think "good cause" is shown for returning the case to the Secretary so that additional

16. See Aaron v. Fleming, D.C.M.D.Ala. 1958, 168 F.Supp. 291, 295 ("I do not interpret the Act to apply only to the totally helpless and bed-ridden nor to those at death's door."); Dunn v. Folsom, D.C. W.D.Ark.1958, 166 F.Supp. 44 (effect of illiteracy and 4th grade education discussed).

17. See 20 C.F.R. § 404.1501 (Supp.1959); Jacobson v. Folsom, D.C.S.D.N.Y.1957, 158 F.Supp. 281, 285.

In their reports to the Administration dated January 13, 1958, and December 23, 1957, respectively, family Doctors Fenichel and Kittell noted that they had advised Louise not to work. Dr. Fenichel checked "complete limitation" as to "functional capacity" of the heart; Dr. Kittell checked "marked limitation."

18. In cases such as this where there is such marked evidence of hysteria, emotional imbalance, and general inability to adjust, the absolute dichotomy of mental and physical is particularly inappropriate.

19. "The reports of Doctors Fenichel and Kittell and the City of New York De-

partment of Hospitals are primarily concerned with the treatment of the plaintiff for heart and respiratory ailments which are irrelevant to the present action as the plaintiff in her application and at the hearing claimed a disability based on her mental impairment." Brief for Defendants, pp. 13–14.

20. See New York Cent. & H. R. R. Co. v. I. C. C., C.C.1909, 168 F. 131, 138–139; 1 Davis, Administrative Law § 8.04 (1958).

21. Berry v. United States, 1941, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945 ("total permanent disability" under the War Risk Insurance Act); Lumbra v. United State, 1934, 290 U.S. 551, 560, 54 S.Ct. 272, 273, 276, 78 L.Ed. 492 (same) (dictum) ("The mere fact that one has done some work after the [critical date] is not of itself sufficient to defeat his claim. * * * He may have worked when really unable and at the risk of endangering his health or life."). See generally Julian v. Folsom, D.C.S.D.N.Y. 1958, 160 F.Supp. 747.

evidence may be taken on the issue of potential physical disability, either by itself or in conjunction with the mental retardation already found.[22]

At the same time I would suggest that the claimant be given an opportunity to augment the evidence concerning her employment by Conti. The Appeals Council's conclusion that Louise performed substantial services was based on an inference from the cold wage record. Perhaps co-workers, supervisors, or other Conti officials could supply additional and more substantial evidence bearing on this issue.

It may be that the science of psychological testing has progressed far enough to provide a test that if administered now to Louise will be able to evaluate her intelligence or related ability at an earlier date. If so, such a test might appropriately be made part of the record although, as I have held, it is not strictly necessary. It would also seem wise to obtain a fuller report from Creedmoor State Hospital than the questionnaire already in evidence.

A final word must be said about Louise's representation at the hearing before the referee. She was represented by her brother, a layman of limited education and experience. At the end of the hearing he said to the referee, "I didn't think it would be like this or I would have a lawyer here and ask the questions. I am not qualified to ask anybody questions." In this last conclusion he is amply supported in the record. Although he tried his best, he was unequal to the job. This problem of inadequate representation in administrative hearings of this nature has already received judicial comment.[23] I add my voice not only in the hope that the general problem will be corrected, but also with the more limited objective that Louise may be aided by legal counsel in the administrative

proceedings that will follow this remand. The case is returned to the Secretary for further action in conformity with this opinion.

---

22. See Little v. Dep't of Health, D.C.S.D. Miss.1959, 173 F.Supp. 276; Wray v. Folsom, D.C.W.D.Ark.1958, 166 F.Supp. 390; Jacobson v. Folsom, D.C.S.D.N.Y. 1957, 158 F.Supp. 281; cf. Stull v. Ewing, D.C.S.D.N.Y.1950, 102 F.Supp. 927, affirmed per curiam, 2 Cir., 1952, 194 F. 2d 707. But see Butler v. Folsom, D.C. W.D.Ark.1958, 167 F.Supp. 684.

23. See Jacobson v. Folsom, D.C.S.D.N.Y. 1957, 158 F.Supp. 281, 286.