Mary C. BRILL, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant.

No. 63–C–34.

United States District Court
E. D. New York.

July 2, 1964.

Figueroa & Madow, New York City, for plaintiff.

Joseph P. Hoey, U. S. Atty., Eastern Dist. of New York, for defendant, Stanley F. Meltzer, Asst. U. S. Atty., of counsel.

ZAVATT, Chief Judge.

The plaintiff herein, Mary C. Brill, has instituted this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review the final decision of the Secretary of Health, Education, and Welfare denying her application for disability insurance benefits. The case is now before this court on defendant's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment.

Mrs. Brill, a woman of fifty-five years of age, first applied for disability benefits on April 6, 1957. This application was denied and no appeal was taken therefrom. Her second application, under consideration herein, was filed on July 21, 1960. In this application the plaintiff alleged that she became unable to work in August 1956 due to an arthritic condition, and that such condition has persisted, rendering her totally disabled. This application was denied on the ground that the plaintiff was not disabled within the meaning of Section 223(c) of the Social Security Act, 42 U.S.C. § 423(c):

"§ 423. Disability insurance benefit payments—Disability insurance benefits

\* \* \*

"(c) For purposes of this section

\* \* \*

"(2) The term 'disability' means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required."

In informing the plaintiff of its decision, the Department stated that:

"The medical evidence shows that you have arthritis in various major joints of your body causing pain and discomfort; however, it is not shown that your over-all ability has been so severely affected as to prevent you from engaging in substantial gainful activity."

Upon plaintiff's request for reconsideration, the Department affirmed its initial determination, noting that:

"You state that you are unable to work because of arthritis. The medical evidence, including examinations by specialists with laboratory tests and X-rays, does not show that your condition is so severe as to prevent you from doing work of a light or moderate nature. It is recognized that you may have some pain and discomfort, however, it has not been demonstrated that there is severe swelling or restriction of movement in the affected joints. You may be handicapped for strenuous activities, but it is not shown that you have been so severely affected as to make you unable to do any type of substantial gainful work."

The plaintiff requested and on June 27, 1962, received a hearing before a hearing examiner of the Social Security Administration. The evidence submitted, testimony received, and conclusions drawn by the hearing examiner will be considered below. On August 30, 1962, the hearing examiner affirmed the prior denial of plaintiff's application. This became the final decision of the Secretary on November 15, 1962, when the Appeals Council denied the plaintiff's request for review. On January 9, 1963, within the sixty day period prescribed by 42 U.S.C. § 405, the plaintiff instituted the present action in this court.

The record before the hearing examiner indicated that Mrs. Brill was brought to this country when she was an infant and has completed one year of high school. Over the years she has been employed in a variety of menial jobs: shoveling manure in a fertilizer factory, operating a burring machine in an aircraft plant during the Second World War,

as a kitchen maid at Bellevue Hospital, and as a cleaning woman at a large insurance company. She was discharged from this last position because her physical condition prevented her from performing the work satisfactorily. Her employer, however, intervened to get her another, less strenuous, position as a mail sorter at another company. The plaintiff's testimony with regard to this last position was that:

"I liked the work only my health—I couldn't go every morning. In the morning I'd get up stiff with the rheumatics and my attendance was very bad."

Mrs. Brill finally quit this job in August 1956 because she "got very sick and * * * ended up in Manhattan General (Hospital) with attacks a couple times of sciatica." Since 1950 the plaintiff has been separated from her husband and has lived with her father, now 86 years old, in a fourth floor walk-up apartment. She testified that her father pays the rent for this apartment, that she receives thirteen dollars a week from her husband, and that she receives financial assistance from her relatives. Shortly after she left her last position, the plaintiff's son died from an overdose of heroin. It appears from the record that he served with the Armed Forces in Korea, and, according to the plaintiff, "came home a complete wreck mentally." As will be revealed by the medical evidence, the effect of her son's death upon the plaintiff is a crucial factor in determining Mrs. Brill's ability or inability "to engage in any substantial gainful activity."

### Medical Evidence

On October 8, 1953, the plaintiff was admitted to Manhattan General Hospital for treatment of pains in her right hip. No radiographic abnormality was disclosed by x-rays and her condition was diagnosed as right sciatica. She was discharged from the hospital a week later, with her condition and progress rated as "good." On October 13, 1954, she was again admitted to Manhattan General for treatment of a pain in her right leg and tremors in the right arm and left buttock. X-rays disclosed no fractures, dislocations or arthritic change and her condition was diagnosed as lipoma of the right arm, sebaceous cyst of the left thigh, and rheumatism of the right lower extremity. The record discloses no further medical examinations until shortly after the death of plaintiff's son. At that time, in the fall of 1956, the plaintiff was seen at the Gynecology and Medical Clinics of the New ork Infirmary. A letter from that institution to the Department reveals that:

"Patient was last seen in our Medical Clinic on 11/12/56. At this time our doctor reported that the ECG done on this patient was normal. Patient appeared to be upset since the death of her son. Patient felt very nervous and complained of pain over right hip while bending. Our doctor's impression at this time was arthritis, right hip and advised x-ray of hip. However, patient did not have this x-ray done."

Less than a year later, on December 26, 1957, the plaintiff was admitted to an unidentified hospital suffering from an overdose of barbiturates. The plaintiff denied, however, that she had attempted suicide; she states that she merely took the pills which her doctor had prescribed for her mental condition. She was discharged from this hospital on December 28, 1957, the diagnosis being depressive reaction and overdose of barbiturates.

The next piece of medical evidence which appears in the record is a report, dated April 29, 1957, by Dr. Catherine J. Caporale, a physician who had been treating the plaintiff since 1952. Dr. Caporale diagnosed the plaintiff's condition as right sciatica; rheumatism and arthritis of the right foot, leg, and hip; hyperthyroidism; menopause; and a severe anxiety state. The plaintiff's progress was reported as static and Dr. Caporale stated that no improvement could be expected. She further reported that she had advised Mrs. Brill not to work.

A medical report submitted to the Department on August 18, 1960, by Dr. Maxwell B. Shaw, substantiates Dr.

Caporale's diagnosis. Dr. Shaw, who had treated the plaintiff regularly for over three years, described her ailment as "pain in both hands, shoulders, neck, thighs, back and ankles," and reported that an x-ray examination on December 10, 1959 disclosed "sl scolosis cervical spine calcified bursitis both shoulder Hyper arthritis spine." Dr. Shaw stated that Mrs. Brill's physical condition had remained unchanged and further stated that her mental condition was one of reactive depression. He stated that as of July 1960 the plaintiff had limited but not restricted use of both hands; approximately 20% restriction of motion in her shoulders, hips, ankles and neck; 30% restriction of motion in her spine; and a 35% loss of use of her left upper and right upper extremities. He further classified, as a serious condition significant to plaintiff's recovery, her "severe psychoneurosis depression state." Dr. Shaw concluded that plaintiff was "100% disabled because of this psychoneurosis."

On December 10, 1959, the plaintiff was admitted to the Hospital of the Jacques Loewe Foundation; her admission note states that:

"This 50 year old female began to have acute pains in both shoulders, neck and lower back 3 weeks ago. She has had some chills and fever and was treated at the Drs. office with injections of cortosone and analgesics as well as physio-therapy. The pains have not improved. Worse in A.M. and at night time. Unable to get out of bed and hospitalization was advised for further care and treatment."

The x-rays taken on that day revealed:

*Cervical Spine: Conclusion*: Slight scoliosis of the cervical spine to the right with minimal limitation of motion and flexion which is compatible with muscle spasm.

*Both Shoulders: Conclusion*: Calcified bursitis both shoulders.

*Lumbo-sacral spine: Conclusion*: Minimal hypertrophic arthritis of the mid lumbar region. Sclerotic changes in the sacral iliac joints indicating arthritic changes in this area."

Mrs. Brill was discharged from this hospital on December 17, 1959. The final diagnosis was:

"Hypertrophic arthritis lumbar and sacro-iliac region and cervical spine. Calcified bursitis both shoulders."

An additional report by a chiropractor, Edmund F. Tamburrino, provided little substantive evidence. A second report submitted by Dr. Shaw on April 20, 1961, reaffirmed his prior diagnosis, noted that plaintiff's response to treatment was "not good," that her condition was static, and that she "cannot walk or do ordinary housework." Dr. Shaw concluded once again that "this patient is permanently and totally disabled." An examination on May 30, 1961, led Dr. Charles McQuade Bastable to conclude that:

"Mrs. Brill is very limited in prolonged walking and standing and in bending, squatting, kneeling and in use of both arms at shoulders. She will get worse."

Plaintiff's "severe psychoneurosis" reported by Dr. Shaw in 1960, and her "severe anxiety state" noted by Dr. Caporale in 1957, was also observed by the Catholic Charities Guidance Clinic in the spring of 1959. At that time the plaintiff had applied to the clinic for psychiatric therapy and it diagnosed her condition as "reactive depression." A clinic reported dated September 12, 1962, noted that:

"At the time that the patient applied for therapy, Mrs. Brill complained of 'terrible headaches and no spirit for anything'. The patient also complained of problems in her family relationships; felt that some of the depression was due to the death of her son. It was also felt at that time that there was some repressed feeling at the anticipation of her daughter's marriage to whom she was quite dependent."

The only medical evidence which would tend to negate this picture of plaintiff's

mentally distressed state is a report submitted by Dr. A. A. Richman on October 21, 1960, following an interview with the plaintiff. In his report Dr. Richman states that:

"The patient presently complains of numerous joint pains, insomnia, irritability and increased tension.

"During the interview, patient was very cooperative and did not present any evidence of increased motor activity. She did repeatedly refer to her lower extremities and back stating 'I always have pains'. Her affect was appropriate. She denied any delusions or hallucinations. Insight and judgment was good.

"The patient stated that she did all of her shopping, took care of the household chores and had a fair social life. She did not present any evidence of depressive episodes (crying spells, lack of drive, and initiative).

"In general, the patient presents somatic complaints, some anxiety and yet has been able to continue with her daily activities (aside from employment)."

The final piece of medical evidence disclosed by the record is a diagnostic evaluation prepared by the Coney Island Hospital on September 28, 1962. Although this report is concerned with plaintiff's mental condition at a time subsequent to October 21, 1960, the cutoff date of her July 1960 application, it is certainly to be considered as having some bearing on her condition during the crucial period. See Barnes v. Celebrezze, 224 F.Supp. 269, 272 (E.D.La.1963). This report reveals the following:

"This patient appears at this clinic complaining of severe depression, tension and anxiety, fatigue, fearfulness and somatic complaints. These have persisted for the past six years. At that time her son, age 21, who had been a drug addict for four years, died from an overdose of heroin. Patient herself took an over-dose of barbiturates after the death of her son. However, she states that she had no intention of committing suicide but just wanted to go to sleep for a long time.

\* \* \* \* \* \*

"UPON EXAMINATION, this is a 53-year old, white female who is fairly neatly attired and groomed. She established good rapport with the examiner. Her productions were spontaneous and coherent. Her mood was one of extreme depression. Her affect was flattened and appropriate to ideation of situation. Patient admits to auditory hallucinations. She hears whispering when alone at home. She also has visual hallucinations. She sees images of her son and when in church she feels the presence of her son sitting close to her and touching her shoulder. Sensorium is clear. She is oriented in all spheres. Insight and judgment are grossly defective.

"DIAGNOSTIC IMPRESSION: SCHIZOPHRENIC REACTION, CHRONIC UNDIFFERENTIATED TYPE

"RECOMMENDATION: Patient was accompanied by her daughter and both were advised that hospitalization would be desirable in her case, but patient refused immediate hospitalization. She stated she would like to try outpatient therapy for a while and would make up her mind at a future date. She was put on Stelazine, 2mg. one TID and will be seen as a drug patient."

A postscript to this report indicates that the plaintiff was seen in the mental hygiene clinic for drug therapy on October 17th. No further report on her subsequent treatment is contained in the record.

After conducting the hearing and examining the evidence of record, the hearing examiner concluded that:

"The record here shows the presence of an orthopedic condition consisting of hypertrophic arthritis and

sciatica, and an anxiety neurosis. It does not appear, however, that either impairment reached serious proportions at the relevant time. In December 1959, x-rays disclosed minimal musculoskeletal findings and little limitation of motion. In August 1960, Dr. Shaw did not indicate that there was any restriction upon the claimant's activities. A month later, he reported no neurological involvement and no atrophy of any of the extremities, and only a 35 percent loss of use of the upper extremities. A 35 percent impairment of an upper extremity constitutes a 21 percent impairment of the whole man; and that degree of impairment of both upper extremities constitutes a 38 percent impairment of the whole man. 'A Guide to the Evaluation of Permanent Impairment of the Extremities and Back', Journal of American Medical Assn., special ed., Feb. 15, 1958, pp. 46, 107 ff. Taking into consideration the limitation of motion in other joints, it would appear that the claimant had only a partial orthopedic impairment. This conclusion is buttressed by the fact that although Dr. Shaw was of the opinion in September 1960 that the claimant was totally disabled, he predicated that view solely upon the claimant's depressive state. Moreover, the record shows that the claimant was able to take care of household chores in October 1960 and at the time of the hearing in June 1962, has been ambulatory and able to use public transportation, and was recently able to write a fairly lengthy statement with very legible handwriting (Exh. 25). The record further shows that the claimant's weight has gradually increased from 128 pounds in 1956 to 143 pounds in June 1962—a fact which tends to negative the existence of severe and unremitting pain. Although the Examiner does not desire to minimize the claimant's distress, the presence of some discomfort is not incompatible with work. Adams v. Flemming, 276 F.2d 901 (C.A. 2)

\* \* \* \* \* \*

"On the entire record, the Examiner finds that the claimant has failed to establish inability, beginning on or before October 21, 1960 and continuously thereafter, to engage in any and all forms of substantial gainful work, including sedentary work, by reason of an orthopedic condition. Cf. Kraynak v. Flemming, 283 F.2d 302 (C.A. 3), affg. 188 F.Supp. 431 (D.Pa.). There are a number of jobs in our economy involving sedentary duties which can be and are performed by persons who are older and have more severe orthopedic impairments than the claimant did on the above date, and which would require little or no training for a new employee, particularly with the claimant's educational and occupational background. Rinaldi v. Ribicoff, C.A. 2, July 3, 1962, (CCH supra, para. 14, 485) [305 F.2d 548]; Graham v. Ribicoff, 295 F.2d 391 (C.A. 9). Indeed, the claimant herself indicated that there were days when she could perform the type of work in which she had engaged at Prentice-Hall. If climbing steps presented a serious problem, it could have been eliminated or at least minimized by living at another residence and by using buses rather than subways.[1]

"The Examiner reaches a similar conclusion respecting inability to engage in substantial gainful work by

---

[1]. This is an assumption not supported by the evidence. Who can say that plaintiff's 86 year old father is willing or can afford to rent other quarters than those presently occupied? Plaintiff is not a free agent. She is dependent upon her father for a roof over her head. Who still believes with Anatole France that: "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." Cournos, Modern Plutarch, p. 27.

reason of anxiety. The Regulations implementing the Act provide that 'The mere presence of psychotic or psychoneurotic symptoms and signs is not necessarily incompatible with the ability to perform substantial gainful work.' 20 C.F.R. 404.1519 (c) (2). Although there is evidence that the claimant has suffered from depression, the episodes have fortunately been temporary. In the opinion of the Examiner, the claimant's condition falls considerably short of the level of continuous severity required by the Act and the Regulations. The latter provide (20 C.F.R. 404.1502(b)) that to show disability—

"It must be established * * * that the applicant's impairment or impairments result in such a lack of ability to perform significant functions—such as * * * in a case of mental impairment, reasoning or understanding, that such individual cannot, with his age, training, education and work experience, engage in any kind of substantial gainful activity. * * *.

"The Regulations give the following example of a disabling mental condition: 'Mental disease (e. g., psychosis or severe psychoneurosis) requiring continued institutionalization or constant supervision of the affected individual.' 20 C.F.R. 404.-1502(a) (6).

"The claimant is not psychotic and there is nothing to show a lack of ability to reason or understand. When examined by a psychiatrist in October 1960, there was no sign of a severe emotional condition. She appears to have functioned adequately since that time. And except for a brief and quite understandable episode of tears when she testified concerning her son's death, the claimant seemed composed and in full possession of her mental faculties at the hearing. So far as this record shows, there is no indication that

since the relevant date, the claimant has been maladjusted in her social life or would have been maladjusted occupationally. Davis v. Flemming, 186 F.Supp. 79 (D.W.Va.).

"It may be that the claimant's condition became worse sometime after October 21, 1960. If so, she may obtain a determination respecting disability after that date by filing a new application. On this record, however, the Examiner finds that statutory disability has not been established beginning on or at any time prior to October 21, 1960. It is the decision of the Examiner that the claimant is not entitled to the establishment of a period of disability or to disability insurance benefits. The determination of the Bureau is affirmed."

■ Section 205(g) of the Act, 42 U.S.C. § 405(g), which empowers this court to affirm, modify or reverse the decision of the Secretary, provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." This court has previously had occasion to note that the scope of review afforded the district courts thereby is quite limited. See, e. g., Crooks v. Folsom, 156 F.Supp. 631, 635 (E.D.N.Y.1957). However, we have also recognized that

"[w]hile the court is aware that the review of administrative decisions should be approached with some deference, based not only on the expertise of the agency, but also on an awareness that Congress placed the administration of a complex body of law in that agency, it is likewise clear that the court may not abdicate its judicial function." Rubin v. Flemming, 172 F.Supp. 590, 592 (E. D.N.Y.1959).

See also, Clemochefsky v. Celebrezze, 222 F.Supp. 73, 75 (M.D.Pa.1963). For the reasons set forth below, this court finds that the determination of the Secretary in the instant case lacks substantial evi-

dentiary support and must, therefore, be reversed.

■■ Section 223(c) (2) of the Act, 42 U.S.C. § 423(c) (2), provides that a three-fold requirement must be met in order to qualify the applicant for disability insurance benefits. First, the applicant must give evidence of a "medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." Second, there must be an "inability to engage in any substantial gainful activity." And finally, it must be shown that this inability exists "by reason of" the impairment. Pollak v. Ribicoff, 300 F.2d 674, 677 (2d Cir. 1962); Celebrezze v. Bolas, 316 F.2d 498, 501 (8th Cir. 1963). There does not seem to be any doubt as to the existence in this case of both physical and mental impairments which can be expected to be of long-continued and indefinite duration. The hearing examiner found that the plaintiff had certain impairments but held that these impairments were not so severe as to preclude any and all forms of substantial gainful employment. This record is replete with medical evidence attesting to these impairments and the only reasonable conclusion to be drawn therefrom is that the plaintiff has satisfied this first requirement.

■■ The crux of the hearing examiner's opinion is his finding that Mrs. Brill possesses an ability to engage in some substantial gainful activity and it is on the propriety of this determination that his decision must stand or fall. The Court of Appeals for this Circuit has held that such a determination:

"requires resolution of two issues— what can applicant do, and what employment opportunities are there for a man who can do only what applicant can do?" Kerner v. Flemming, 283 F.2d 916, 921 (2d Cir. 1960).

Accord, Celebrezze v. Bolas, supra; Hayes v. Celebrezze, 311 F.2d 648 (5th Cir. 1963); Graham v. Ribicoff, 295 F.2d 391 (9th Cir. 1961); Hall v. Flemming, 289 F.2d 290 (6th Cir. 1961). Moreover, in applying this test "[m]ere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available." Kerner v. Flemming, supra, 283 F.2d at 921. See also, Pollak v. Ribicoff, supra. In other words, "[t]he word 'any' [substantial gainful activity] must be read in the light of what is reasonably possible, not of what is conceivable." Klimaszewski v. Flemming, 176 F.Supp. 927, 932 (E.D. Pa.1959). See also, Celebrezze v. Bolas, supra; Hodgson v. Celebrezze, 312 F.2d 260 (3d Cir. 1963).

Kerner v. Flemming, supra, a landmark Second Circuit opinion in this field, makes it clear that the Secretary's decision in the instant case cannot be permitted to stand. In Kerner the hearing examiner denied the plaintiff's application on the ground that the record did not show that his condition had "been so seriously affected that he would be completely unable to engage in any kind of substantial gainful activity, including some form of light or part-time sedentary work." 283 F.2d at 918. The court rejected such a finding:

"Here is a man, admittedly able to do only light work, and this at a location reachable without undue exertion, and presenting a prospective employer with the unattractive combination of age, heart disease, diabetes and acute worry about himself. No one of these factors might be fatal to employment—indeed, the constellation of them may not be— *but the Secretary had nothing save speculation to warrant a finding that an applicant thus handicapped could in fact obtain substantial gainful employment."* 283 F.2d at 921. (Emphasis added.)

■■ The rule thus formulated, i. e., that the Secretary must specify more than a theoretical ability to engage in substantial gainful activity, has been clarified somewhat by subsequent Second Circuit opinions. In Rinaldi v. Ribicoff, 305 F.2d 548 (2d Cir. 1962) the court held that this requirement might be satis-

fied by reference to governmental studies showing the availability of certain types of employment. A similar conclusion may be drawn from Pollak v. Ribicoff, supra, where the court approved the use of such studies in Graham v. Ribicoff, supra.[2] But it is still established beyond peradventure that a mere conclusory finding of an ability to do light or sedentary work will not justify a denial of disability benefits. In its most recent decision on the subject, the Court of Appeals of this Circuit has reaffirmed its Kerner rule, stating that a denial of benefits predicated upon the availability of such employment, must "be accompanied by a specification of types of employment opportunities actually available" to the applicant. Ber v. Celebrezze, .332 F.2d 293, 295 (2d Cir. 1964).

Notwithstanding this well established rule, the hearing examiner in the instant case merely concluded that the plaintiff had failed to establish inability "to engage in any and all forms of substantial gainful work, including sedentary work, by reason of an orthopedic condition. Cf. Kraynak v. Flemming, 283 F.2d 302 (C.A. 3), affg. 188 F.Supp. 431 (D. Pa.)."[3] He reached a similar conclusion regarding plaintiff's ability to engage in substantial gainful employment notwithstanding her mental impairment.

Apparently cognizant of the Kerner rule, the examiner found that:

"There are a number of jobs in our economy involving sedentary duties which can be and are performed by persons who are older and have more severe orthopedic impairments than the claimant did on the above date,

and which would require little or no training for a new employee, particularly with the claimant's educational and occupational background. Rinaldi v. Ribicoff, * * * Graham v. Ribicoff, * * * Indeed, the claimant herself indicated that there were days when she could perform the type of work in which she had engaged at Prentice-Hall. If climbing steps presented a serious problem, it could have been eliminated or at least minimized by living at another residence and by using buses rather than subways."

Several observations must be made with respect to this finding. To begin with, the examiner's reference to Mrs. Brill's statement that there were days when she could do the type of work she did at Prentice-Hall cannot be considered as a satisfaction of the Kerner rule. As will be discussed below, the fact that there are *days* when the plaintiff's physical impairment would permit her to do some work does not mean that an opportunity to do so would be available to her; nor does it take into account the effect of plaintiff's mental impairment upon such an opportunity. However, its generality and use after his statement that "there are a number of jobs" along with its conjectural nature, renders this finding unsatisfactory. It is certainly not "a specification of types of employment opportunities actually available" to the plaintiff. Ber v. Celebrezze, supra.

It is likewise clear that the mere citation to Rinaldi v. Ribicoff, supra, and Graham v. Ribicoff, supra, will not satisfy the Kerner rule. As indicated above,

---

2. The Third Circuit has rejected this view, holding that resort to governmental studies will not justify a finding that employment opportunities exist for an applicant unable to continue his past employment. In Stancavage v. Celebreeze, 323 F.2d 373, 377–78 (3d Cir. 1963) the court states that:

   "we are not persuaded that such evidence moves far enough away from the realm of conjecture and theory when applied to the facts before us. * * * There must be something more tangi-

ble establishing what employment opportunities there are for a man with his impairment."

3. Why the hearing examiner, sitting in the Second Circuit, chose to draw his legal support from the Third, rather than the Second Circuit, or precisely what support he sought to find in the Kraynak case, is not clear. A careful reading of both the District Court and Circuit Court opinions in that case fails to disclose any support for the hearing examiner's finding.

these cases found that reference to governmental studies showing the availability of employment opportunities would be satisfactory. However, the hearing examiner made no such reference, and relied solely upon his citation of these two cases in finding such opportunities to exist. Were the court to sanction this procedure, the rule thus established by our Court of Appeals would be reduced to a meaningless formality—an administrative official, required, at the very least, to make reference to a study in order to support his finding, would then be able to meet his case-imposed obligation by merely citing the case which imposed it. Neither the Secretary nor this court can be permitted to engage in such circuitous reasoning.

■ Some additional comments are in order. Ber v. Celebrezze, supra, casts further doubt upon the examiner's finding that:

> "There are a number of jobs in our economy involving sedentary duties which can be and are performed by persons who are older and have more severe orthopedic impairments than the claimant. * * *"

In Ber the court noted that the claimant's impairments were of a type which might have caused many people less pain and restriction than the plaintiff therein complained of. This, however, was not controlling; what was important to the Second Circuit was that "in her particular medical case these symptoms were accompanied by pain so very real to her and so intense as to disable her." 332 F.2d at 296. Similarly, as to the examiner's determination that Mrs. Brill's medical history is insufficient to show a physical disability, we must again turn to the Ber case. The examiner concluded that plaintiff has only a 35% impairment of her upper extremities; that such an impairment is merely a 38% impairment of the whole woman; and that "[t]aking into consideration the limitation of motion in other joints, it would appear that the claimant had only a partial orthopedic impairment." The Court of Appeals has shown us the defect of such determinations:

> "The critical issue in this case was one which could not be resolved merely by determining what objectively observable physical changes had taken place in Mrs. Ber's bone and muscle structure as a result of her arthritic condition, and then placing these observable changes alongside other similar changes in other persons so as to measure arthritic conditions on an imaginary scale with calibrations ranging from 'mild' to 'severe.' The ultimate question was whether the arthritic changes which had taken place in Mrs. Ber's body did, in view of her individual physical and mental make-up, cause pain which became so intensely severe to her that, as she testified, it forced her to quit working." 332 F.2d at 298–299.

The test to be applied in these cases must of necessity be a subjective one; it is of little consequence to Mrs. Brill that the examiner has found her condition to be one which would not disable another person, if it has, in fact, disabled her. "[T]he definition of disability cannot be considered *in vacuo* * * * [it] relates to the individual claimant." Klimaszewski v. Flemming, supra, 176 F. Supp. at 931. "[S]urely our ever-enlarging bureaucracy has not yet reached the stage of 'expertise' that it can depersonalize a person's illnesses." Aaron v. Fleming [sic], 168 F.Supp. 291, 295 (M. D.Ala.1958).

■ While the administrative decision herein must be vacated due to the examiner's failure to satisfactorily address himself to the requirements of Kerner v. Flemming, supra, the particular facts of this case make it advisable for the court to further inquire into the availability of substantial gainful employment for Mrs. Brill. Although it is customary to remand the ordinary case to the Secretary for further evidentiary findings, but see Stancavage v. Celebrezze, 323 F.2d 373

(3d Cir. 1963),[4] the court must note with dismay that it has now been almost four years since the plaintiff filed her application for these benefits and almost eight years since she allegedly became unable to work. Under such circumstances, a final determination at this time, if warranted by the facts herein, would be desirable. See Ber v. Celebrezze, supra. 42 U.S.C. § 405(g) empowers the court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

What substantial gainful activity could the plaintiff, as of October 21, 1960, and continuously thereafter, have engaged in? In answering this question, the court must ascertain, with somewhat more clarity than is evident from the hearing examiner's decision, the extent to which the plaintiff's physical *and* mental impairments combined have affected her ability to engage in such activities. That she has certain orthopedic impairments is not denied, although we are told that the impairment in her upper extremities is such that she is still, to paraphrase the hearing examiner, 62% of a whole woman. Similarly, the hearing examiner, having separately considered plaintiff's mental condition, concluded that it "falls considerably short" of the degree of severity required by the Act. What has not been satisfactorily considered, however, is what substantial gainful activity this woman, with both her physical *and* mental impairments, can be expected to engage in. This omission is akin to that criticized by the court in Underwood v. Ribicoff, 298 F.2d 850, 854 (4th Cir. 1962):

"The Referee's report tends to fractionalize the several ailments and to treat each one in isolation as a clinical medical problem rather than treating it within the framework of Claimant's work history, educational background, and age."

In Farley v. Celebrezze, 315 F.2d 704, 707–708 (3d Cir. 1963), after noting that either the physical or mental impairments of the claimant, when considered separately, might render him disabled, the court states that:

"there is no need to consider mental and physical condition separately. We have come too far in our knowledge of the interrelationship of mind and body totally to truncate one from the other in our considerations. Just as all physical and all mental impairments must be taken into account in determining the extent of disability, so may physical and mental impairments in their totality result in a finding of disability."

Similarly, in Sisia v. Flemming, 183 F. Supp. 194, 201 (E.D.N.Y. 1960), this court noted that:

"The Appeals Council should have considered whether (claimant's) * * * physical impairments, either alone or in combination with her mental state, amounted to disability."

It may well be, although we have found the hearing examiner's determination insufficient in this respect, that were plaintiff's physical impairment the sum total of her disability, she could find substantial gainful activity. But such is not the case. The testimony at the hearing, along with the medical evidence contained in this record, indicates a mental impairment which as of October 1960 should have been considered, and, indeed, has since proven to be, of long-continued and indefinite duration. This impairment has a marked bearing upon plaintiff's ability to secure substantial gainful employment. One doctor, who had treated Mrs. Brill for over three years, termed her mental condition a "severe psychoneurosis state" and concluded that she

---

4. In this case the Third Circuit, after finding that the Secretary had not shown what employment opportunities were available to the applicant, entered final judgment for the applicant stating that "it must be presumed that the best available proof on this has been presented." 323 F.2d at 378.

was "100% disabled because of this psychoneurosis." Another doctor, who treated plaintiff for five years, and who seems to have concluded that she was disabled because of both her physical and mental conditions, described plaintiff's mental impairment as a "severe anxiety state." A clinic, acting upon plaintiff's application for psychiatric therapy, diagnosed her condition as "reactive depression." A subsequent hospital report, which has some evidentiary bearing on this question, see page 301, supra, noted extreme depression, auditory and visual hallucinations, grossly defective insight and judgment, and diagnosed her condition as schizophrenic reaction, chronic undifferentiated type. It considered this impairment to require hospitalization. One the other hand, there was only one medical report, based upon a single interview, which tended to negate the extent of plaintiff's mental impairment. This was the report submitted by Dr. Richman, see pages 301, 301, supra, and which was relied upon heavily by the hearing examiner. It must be noted, however, that at the hearing Mrs. Brill either denied making the statements attributed to her in this report, denied that such statements, if made, were accurate, or could not remember having been asked or having given answers pertaining thereto.

This is not to say that the evidence was such that the only reasonable conclusion to be drawn therefrom is that plaintiff's mental impairment alone rendered her disabled within the meaning of the Act. What is clear, however, is that this mental condition was not to be considered, as it was by the hearing examiner, independent of and apart from the plaintiff's physical impairment. Counsel for the Secretary has presented this court with exemplary memoranda supporting the hearing examiner's decision; but not even the persuasive arguments contained therein can surmount the effect of this basic error.

Properly posed, the question to which the hearing examiner should have addressed himself is: Considering both the physical and mental impairments suffered by the plaintiff, as well as her educational and vocational training, are there any types of employment opportunities actually available to her?

It has been said, with some hyperbole, that strict adherence to the Kerner rule would transform hearing examiners into employment counselors. Insofar as Kerner compels the examiner to make a realistic appraisal of the applicant's employment potential, there may be a nucleus of truth in such a statement. Indeed, a hearing examiner would be well advised to imagine himself in the position of an employment counselor before he finds that employment opportunities are actually available to a particular applicant. Had the examiner in the instant case done this, what factors would he have considered? Admittedly, he would proceed from the premise that the plaintiff's physical impairment precludes her from all but light or sedentary work. Assuming the availability of such situations to a 53 year old woman with a record of shoveling manure, working as a charwoman, as a kitchen maid, etc., what particular qualifying characteristics of plaintiff would he make reference to when recommending her to a prospective employer? Clearly, neither her ninth grade education nor past employment experiences would be brought to the forefront. Would he speak of her past attendance record—one which shows that at Prentice-Hall, even before the onset of her mental impairment, the plaintiff's absenteeism was so frequent that her supervisor "always used to threaten to fire" her? Would he indicate that several doctors found her to be disabled and that a doctor, enlisted by the Secretary, warned that she is "very limited in prolonged walking and standing and in bending, squatting, kneeling and in use of both arms" and that "she will get worse"? Would he make much of her crying spells ("Sometimes it happens twice a week, then it won't happen for a month or two"); her admission that "I keep dropping things and a couple of times I fell down the stairs"; or the fact that her eyes were so weak that she asked the ex-

aminer to read her own statement to her? Would he report that at an interview with a representative of the Department the interviewer noted that "she appeared to be in pain"; that "her actions were all very slow"; that she groaned when she got up from the chair" and that "she appear[ed] to be very depressed"? Would attention be called to the fact that plaintiff reported to the Appeals Council that:

> "I always feel groggy, with pain and heaviness of my shoulders and I am always in a fog feeling as though in another world. I am surrounded by voices and cannot remember, all the times I am mostly with my mind empty. My eyes feel swollen and sore as if someone stepped on them. I have a crying jag inside and pain deep inside of me. All seems lost and there is nothing to live for. I wear dark glasses all the time so that no one can see me and I can hide from them."

In short, what would this hearing examiner, turned employment counselor, do with this physically impaired woman with a mental impairment which he considers to fall "considerably short" of the level of severity required by the Act? Had he considered these factors acting in concert with each other, it seems clear that the examiner would have realized that this record fails to disclose a single factor which bespeaks the reasonable possibility that Mrs. Brill, as of October 21, 1960, could have secured substantial gainful employment. It should have been of little moment to the examiner that Mrs. Brill testified that there were days when she felt that she could do work similar to that which she performed at Prentice-Hall. This may be so—just as it may be so that there will be days when she will not have a sciatica attack, or a crying spell; days that she will be able to get up from bed and descend the stairs without falling; and days that she will be able to pass without dropping things or having hallucinations. But the possibility of such days can be of scant significance to an employer, who, regardless of the type of employment he offers, must demand a minimum amount of stability, competence, and reliability from his employees.

No further evidentiary finding can negate the fact that plaintiff has none of these qualities to offer to a prospective employer. Indeed, considering plaintiff's physical and mental impairments combined, the only supportable finding which can be drawn from this record is that Mrs. Brill was, as of October 21, 1960, unable to engage in any substantial gainful activity.

Having concluded that plaintiff has mental and physical impairments which should have been, and apparently were, expected to be of long-continued and indefinite duration by the hearing examiner, and having found that the only evidentially supportable conclusion herein is that plaintiff was, as of the crucial date, unable to engage in any substantial gainful activity, we must now consider whether this inability exists "by reason of" her impairments. Pollak v. Ribicoff, supra; Celebrezze v. Bolas, supra. As indicated from the discussion above, the court must answer this question in the affirmative. Had the hearing examiner not erroneously concluded that no inability was present, it seems clear that he would have reached a similar conclusion. We are not presented herein with a case of voluntary withdrawal from the labor force, but, rather, with a woman whose physical condition and severe depressive state compels such a withdrawal. Surely to the extent that plaintiff's physical impairment has rendered her disabled, no one will contend that such disability is self-imposed—and in light of the present day understanding of mental illness, this court cannot attribute any lesser degree of compulsion to the extent that this disability stems from plaintiff's mental impairment. Considered together, these impairments have removed Mrs. Brill from the ranks of the employable and have rendered her unable to engage in any substantial gainful activity.

The defendant's motion for summary judgment is denied. Although

310

the plaintiff has not made a cross-motion for summary judgment, such relief may, and hereby is, granted.  Local 33, International Hod Carriers Bldg. and Common Laborers' Union of America v. Mason Tenders, 291 F.2d 496, 505 (2d Cir. 1961).  It is the opinion of this court that plaintiff is entitled to the disability insurance benefits which she applied for on July 21, 1960, and the Secretary is hereby directed to process said application accordingly.

Settle an order consistent herewith on or before ten (10) days from the date hereof.